**MASHPEE TRIBE, et al.,
Plaintiffs, Appellants,**

v.

**SECRETARY OF the INTERIOR, et al.,
Defendants, Appellees.**

No. 86–1615.

United States Court of Appeals,
First Circuit.

Argued Feb. 5, 1987.

Decided June 1, 1987.

Robert C. Hahn with whom William A. Hahn, and Hahn & Matkov, Boston, Mass. were on brief, for plaintiffs, appellants.

Allan van Gestel with whom Celia D. Moore, and Goodwin, Procter & Hoar, Boston, Mass. were on brief, for defendants, appellees, Town of Edgartown, Town of West Tisbury, and Hope G. Ingersoll.

Thomas R. Kiley, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., and Paul R. Matthews, Asst. Atty. Gen., Boston, Mass. were on brief, for state defendants, appellees.

Jacques B. Gelin, Dept. of Justice, with whom F. Henry Habicht II, Asst. Atty. Gen., Robert S. Mueller, U.S. Atty., Robert J. Klarquist, and Pauline H. Milius, Dept. of Justice, Washington, D.C. were on brief, for federal defendants, appellees.

Leonard Kopelman, Barbara J. Saint Andre, and Kopelman and Paige, P.C., Boston, Mass. on brief, for defendant, appellee, Town of Plymouth.

Before BREYER, ALDRICH and SELYA, Circuit Judges.

BREYER, Circuit Judge.

The appellants in this case are Indians who seek declaratory judgments confirming recognition of their tribes and acknowledging the tribes' "Indian title" to certain land in southeastern Massachusetts. "Indian title," also known as "aboriginal title," is the right of Indian tribes to use and

**482**

occupy "lands they had inhabited from time immemorial." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985) (*Oneida II*). Termination of this title requires consent of the sovereign. *See id.; Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974) (*Oneida I*). Appellants claim that they have title to the land in question because the Massachusetts statutes that purported to give their ancestors the power to alienate their property, 1870 Mass.Acts ch. 293, and that transferred some of the disputed land to the Town of Mashpee, 1869 Mass.Acts ch. 463, were invalid. According to appellants, only the federal government could legally authorize Indian tribes to dispose of Indian title to their lands. Because the federal government did not grant appellants' ancestors permission to alienate their land, appellants argue that any conveyances were ineffective; title therefore remained with the Indian tribes the appellants claim to represent (perhaps eventually passing to individual appellants).

■ The dispositive issue on this appeal can be stated simply. Have the appellants shown that the entities whose rights they seek to assert—the Mashpees, Christiantowns, Chappaquiddicks, Herring Ponds, and Troys—were in fact tribes in the late 1860s when the Massachusetts statutes were enacted and (presumably) the relevant ancestors tried to convey title? It is well established that the most important statute the appellants invoke—the Indian Nonintercourse Act, 25 U.S.C. § 177—allows recovery only if plaintiffs show they are or properly represent entities that 1) were tribes at the time the land was alienated and 2) remain tribes at the time of suit. *See James v. Watt*, 716 F.2d 71, 72 (1st Cir.1983); *Epps v. Andrus*, 611 F.2d 915 (1st Cir.1979); *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 581 (1st Cir. 1979), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 378 (1st Cir.1975). Alternative legal authority upon which appellants base their claims, namely federal

common law and the Indian Commerce Clause, also (at best) protect a *tribe*'s title to land. *See* U.S. Const. art. 1, § 8 (empowering Congress to "regulate Commerce ... with the Indian tribes"); *Oneida II, supra* (permitting a tribe to assert a claim under federal common law); *Canadian St. Regis Band of Mohawk Indians v. New York*, 573 F.Supp. 1530 (N.D.N.Y.1983) ("To the extent that the individual plaintiffs purport to maintain an ejectment action under federal common law, ... the individual plaintiffs lack standing because they lack title."). Appellants can assert only *tribal* claims and must therefore show that the allegedly invalid conveyances made sometime subsequent to the 1869 and 1870 statutes were conveyances of title by entities existing as tribes.

In an earlier stage of this litigation, the Mashpees tried before a jury the issue of tribal status. *See Mashpee Tribe v. New Seabury Corp.*, 447 F.Supp. 940 (D.Mass. 1978) (*Mashpee I*), aff'd, 592 F.2d 575 (1st Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979). In that case, the district court adopted the definition of "tribe" used in *Montoya v. United States*, 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521 (1901), and instructed the jury that a "tribe" is a "body of Indians of the same or similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *Id.* at 266, 21 S.Ct. at 359; *see Mashpee I*, 592 F.2d at 582. Applying this definition, the jury decided that the Mashpees failed to prove their tribal existence *as a matter of fact*, and the court dismissed the case.

■ The district court dismissed the present appellants' cases because they also failed to establish their tribal status. In our view, the court's decision was legally correct. It was correct with respect to the Mashpees because their "effort to relitigate the tribe's claim is barred by elementary principles of res judicata." *Mashpee Tribe v. Watt*, 707 F.2d 23, 24 (1st Cir.), *cert. denied*, 464 U.S. 1020, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983). It is correct with

respect to all five Indian entities for the following reasons.

■ Appellants claim that four nineteenth century documents establish their tribal status. We have printed these documents in an appendix. They include (1) several pages from an appendix to "A Report to the Secretary of War of the United States, On Indian Affairs, Comprising a Narrative of a Tour Performed in the Summer of 1820, Under a Commission from the President of the United States, for the Purpose of Ascertaining the Actual State of the Indian Tribes in our Country," by Rev. J. Morse; (2) a report from Thomas McKenney that is included in the appendix to "Indian Treaties and Laws and Regulations Relating to Indian Affairs" (1826); (3) some statistical tables included in H.R.Rep. No. 474, 23d Cong., 1st Sess. (1834); and (4) a statistical table from Henry Schoolcraft's "Historical and Statistical Information Respecting the History, Condition and Prospects of the Indian Tribes of the United States" (1850). Some or all of these documents refer to Mashpees, Christiantowns, Chappaquiddicks, Herring Ponds, and Troys as "tribes." Appellants have not specifically argued that these documents show tribal status as a matter of fact under the standard of *Mashpee I.* Appellants argue instead that they show tribal status as a matter of law or through the operation of a principle akin to estoppel. Regardless of the legal lens through which we view these documents, however, we find them inadequate to show tribal status.

The initial document, an appendix to the 1820 Report by Reverend Morse, calls the appellant Indian groups "tribes," but it also refers to them as "remnants." It says that in 1820 there were 320 Indians at Marshpee, 40 at Herring Pond, 48 at Troy, and 340 on Martha's Vineyard. It notes that "the number of *pure blooded* Indians [at Mashpee] is extremely small, say fifty or sixty, and is rapidly decreasing," and that these Indians "have altogether adopted the habits of civilized life." It says that Harvard College and a religious society provide for the Indians' moral and religious instruction while the State takes care of the "infirm and aged poor" and manages their lands. It states that the number of Indians at Marshpee is "diminishing, though rather slowly," and that those at Herring Pond—"not more than forty"—have considerable territory "but their affairs are embarrassed and probably at no distant day, Government will see fit to dispose of their land." If we apply the legal standard of *Mashpee I* to this document, it suggests that *as of 1820* the Mashpees, Herring Ponds, and Troys "inhabit[ed] a particular territory," but it does not suggest that they were "united in one community under one leadership or government," and it is ambivalent on the matter of "same or similar race." A fortiori, it is inadequate to show the existence of these tribes as a matter of fact at the relevant time of conveyancing, fifty years or more later.

The remaining documents add nothing of factual value. The second document, an appendix to "Indian Treaties and Laws and Regulations Relating to Indian Affairs" of 1826 uses the same numbers as the 1820 document. Thus, one might reasonably believe its author simply took his numbers from Rev. Morse. The third document, published in 1834, repeats the Morse numbers and adds nothing to them. The fourth document, an 1850 Bureau of Indian Affairs survey by Henry Schoolcraft, also seems to be based on the 1820 Morse Report. The number of Indians that it lists as living in Maine, for example, is 956, the same number Morse used 25 years earlier. Schoolcraft says there were 847 Indians living in Massachusetts, 107 more than Morse reported in 1820, but Schoolcraft's tables list several tribes not mentioned in the earlier report. Schoolcraft does not describe the factual circumstances under which the Indians live, but he contrasts their condition to other Indians whom he calls "tribes" by referring to the Massachusetts Indians as "fragmentary tribes." Thus, appellants had good reason for declining to argue that these documents could support a factual finding of tribal status. We do not see how, simply as measured under the *Montoya* standard, they could do so.

Appellants instead claim that the four documents (along with the underlying facts they evidence) are enough to show that the federal government has *recognized* the five entities as "tribes." And they argue that the federal courts, as a matter of law, must follow the lead of the executive branch in these matters. They cite the Supreme Court's statement 120 years ago:

In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.

*United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1866). The difficulty with this argument is that neither the executive nor the legislative branch of the federal government has recognized the five entities as tribes; and the four documents fail to show the contrary.

The ordinary standard for "recognition" is set forth by Professor Cohen as follows:

Normally a group will be treated as a ... "recognized" tribe if (a) Congress or the Executive has created a reservation for the group by treaty, agreement, statute, executive order, or valid administrative action; and (b) the United States has had some continuing political relationship with the group.

F. Cohen, *Handbook of Federal Indian Law* 6 (1982). This standard is not met. A congressionally authorized compilation of all such documents from the nineteenth century that might satisfy this standard (including proclamations and unratified treaties) was published in 1904. *See* C. Kappler, *Indian Affairs*, Sen. Doc. 319, 58th Cong., 2d Sess. (1904). The two volumes of this compilation do not mention any of the five groups before us. In addition, the Supreme Court, in a case decided after the publication of the four documents here in issue, described the Massachusetts Indians as "remnants of tribes never recognized by the treaties or executive acts of the United States as distinct political bodies." *Elk v. Wilkins*, 112 U.S. 94, 108, 5

S.Ct. 41, 48, 28 L.Ed. 643 (1884). Recently, the Bureau of Indian Affairs has published a list that purports to include all Indian groups acknowledged as tribes either by executive or administrative action. *See* 51 Fed.Reg. 25115 (July 10, 1986). That list does not contain the names of any of the five Indian entities. Given this negative evidence, we do not see how (1) Rev. Morse's Report to the Secretary of War, (2) a reference in a statistical table in the War Department's Office of Indian Affairs Report, (3) a reference without tribal names in a House of Representatives Committee Report, and (4) a reference to "fragmentary tribes" in a Bureau of Indian Affairs Report can constitute federal recognition. These documents, whether taken individually or together, do not provide evidence of a "treaty, agreement, statute, executive order, valid administrative action," or of a continuing relationship between the Indian groups and the United States.

The sole authority arguably supporting appellants' claim to the contrary is an 1896 court of claims case, *Tully v. United States*, 32 Ct.Cl. 1 (1896), in which that court cited reports by Bureau of Indian Affairs agents as evidence of federal recognition of tribes. That case, however, involved an Indian group that, as a matter of fact, *met* the *Montoya* definition of "tribe." The group in question inhabited a specified geographical area, was composed of a related group of families, and had separate political leadership. Moreover, the group's parent nation, the Apache Nation, had been recognized by treaty, and sought to show that the group was a separately recognized tribe so that the Nation would not be held liable as a whole for the damage the subgroup had caused. *See* Indian Depredation Act of 1891, 26 Stat. 857. The fact that the court of claims used the agents' reports as additional evidence, given the facts, of an affiliated subgroup's separate status for Depredation Act purposes does not show that such evidence is sufficient, in the absence of strong supporting facts, to show that a group is a "tribe" for land recovery purposes. Thus, *Tully* does not change our previous conclusion.

Finally, the appellants argue that the government is "estopped" from denying their status as a tribe. By this argument they apparently mean that the government, having caused the deterioration of tribal life and the disappearance of these tribes, should not now be allowed to take legal advantage of those wrongs by being permitted to deny the existence of the very organization they destroyed. *Cf. Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232, 79 S.Ct. 760, 761, 3 L.Ed.2d 770 (1959) (noting that the principle that "no man may take advantage of his own wrong" is "deeply rooted in our jurisprudence"). Even if we leave aside such legal questions, however, as whether it is legally permissible here to estop the federal government, *see Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); *Phelps v. Federal Emergency Management Agency*, 785 F.2d 13, 17 (1st Cir.1986), or whether appellants have shown that the federal government in fact caused these tribes to disappear, we cannot accept this argument. If it is interpreted as broadly as appellants must interpret it to prevail, it proves too much. Because many, if not all, former Indian tribes disappeared as a result of the encroachment of non-Indian culture, the argument, in effect, would nullify the legal requirement we previously pointed out that Indian groups prove tribal status. The law does not permit us to nullify that requirement.

The judgment of the district court is

Affirmed.

A

# REPORT

TO THE

## SECRETARY OF WAR

OF THE UNITED STATES,

## ON INDIAN AFFAIRS,

### COMPRISING A NARRATIVE OF A TOUR

PERFORMED

IN THE SUMMER OF 1870, UNDER A COMMISSION FROM THE PRESIDENT OF THE UNITED STATES, FOR THE PURPOSE OF ASCERTAINING, FOR THE USE OF THE GOVERNMENT, THE ACTUAL STATE OF THE INDIAN TRIBES IN OUR COUNTRY:

ILLUSTRATED BY A MAP OF THE UNITED STATES; ORNAMENTED BY A CORRECT PORTRAIT OF A PAWNEE INDIAN.

## BY THE REV. JEDIDIAH MORSE, D. D.

Late Minister of the First Congregational Church in Charlestown, near Boston, now resident in New-Haven.

### NEW-HAVEN:

Published by Davis & Force, Washington, D. C.; Cushing & Jewett, Baltimore; W. W. Woodward, and E. Littell, Philadelphia; Spalding & Howe, and R. N. Henry, New-York; E. & E. Hosford, Albany; Howe & Spalding, New-Haven; O. Goodwin & Sons, Hudson & Co. O. D. Cooke & Sons, Hartford; Richardson & Lord, S. T. Armstrong, Lincoln & Edmunds, Cummings & Hilliard, and O. Clark, Boston.

PRINTED BY S. CONVERSE.

1822.

that time, even after the numbers of the natives, during the preceding century, had been greatly reduced."[*]

In the gradual diminution, and final extinction, of these tribes, who were the terror of the early settlers, we have a melancholy specimen of what has happened in like manner to all the Indian tribes, who once inhabited the territory of New-England, except the few feeble remnants we have enumerated; and of hundreds of other powerful tribes, once spread over the settled parts of our country. And such will be the inevitable destiny of all Indians now mingled among our white population, if a radical change in our treatment of them, be not adopted.

### MASSACHUSETTS.

All the Indians remaining in this State, reside on their respective Reservations at Marshpee, Herring Pond, Martha's Vineyard and Troy, in the south east part of the State, from fifty to one hundred miles from Boston. The State, by a Board of Overseers, exercises a guardian care over them, as to their lands, and civil rights and privilege; and the corporation of Harvard College, and "The Society, or propagating the gospel among the Indians and others in North America," provide for their religious and moral instruction; each having charity funds in its Treasury, appropriated to the benefit of Indians, the former $12,000, the latter, $9,000. A stated missionary is supported at Marshpee, and another at the Vineyard, who, as they have opportunity, visit the other remnants at Herring Pond, and Troy.

No official census of these Indians has recently been taken. They are estimated in our table, at 750, viz; at Marshpee 320; Herring Pond, 40: Troy, 40; the remainder at Martha's Vineyard.

* Mr. Williamson is preparing a history of this State; and from our knowledge of the means he is employing to collect his materials, we anticipate from his pen, a correct and valuable work.

488

Their lands are held in common, and are unalienable, but with the consent of their overseers.* Some have gardens, and cultivate their lands to a considerable extent and advantage. The wood on their Reservations, pipe clay found on one of them at Martha's Vineyard, and pasturing the cattle of the white people, are sources of income. Many of the young men are employed in the whale and other fisheries, and shew much skill in their employments; and all have at their command, the means in abundance of living in comfort, and even in affluence, if they had but the knowledge, and the dispositions, to use them. Their infirm and aged poor, are considered as foreigners, and taken care of by the State. The Indians are not taxed; have no voice in elections, none of the rights and privileges peculiar to the citizens of the Commonwealth. In this, their state differs from that of the free negro population, who are taxed, and have the right of voting in elections, which many of them regularly exercise, and are eligible to the highest offices in the government; though other than *legal* obstacles, have prevented this sable race from receiving any of the civil honors, or offices of the state, or town, in which they reside.

The following are valuable and pertinent communications from missionaries residing among these Indians. In answer to questions forwarded to Rev. Mr. Fish, the worthy and intelligent missionary stationed at Marshpee, he writes me thus under dates of Feb. 1820, and Jan. 1821.

" I will answer your several inquiries as well as I am able.

1. As to the descent of the Indians of these parts, I believe it cannot be traced at this day. They have altogether adopted the habits of civilized life; of course, have forgotten their ancient names, and indeed their language also, with the exception of a very few individuals, who retain a slight knowledge of it, and are able to converse a little.

2. The number of *pure blooded* Indians is extremely small, say fifty or sixty, and is rapidly decreasing. The mixture of blood

* These overseers are appointed by the government of the State, and their duties are, as guardians of the Indians, to see that they are not mal-treated by the white people, and to advise them in the management of their affairs.

, arises far more fre uentl s from connexion with negroes, than with whites.

3. Professors of religion are considerably numerous. Perhaps there may be *fifty*; composed of Congregationalists and Baptists ; a few of whom are eminently pious, considerable numbers decent in their lives, and not a few shockingly profligate. The number of men and women are perhaps nearly equal. The state of morals generally is lov.' Intemperance, with its concomitants, is found among them, as with almost all Indians. They manifest a wish, however, to have their children instructed. Schools are maintained among them at the expense of the plantation ; 'and though increased means of instruction would be desirable, there are few children, who are not taught to read and write.

4. Their territory comprises about 13,000 acres, worth on an average about four lollars an acre ; held in joint stock (except what individuals chcose to cultivate and enclose, which is theirs, not in fee, but only in til age) guaranteed to them by the State, managed by a Boar. of Overseers, appointed by the Governor and Council, and rei dered unalienable, except by legislative authority.

5. As to the plan of reo oving them, *were they in favor of the measure*, it would scarcely be an object. They are of public utility *here*, as expert wh alemen and manufacturers of various light articles; have lost their sympathy with their brethren of the forest; are in posses ion o. many privileges, peculiar to a coast, indented by the sea; their local attachments are strong; they are tenacious of their lar. ls; of course, the idea of alienating them and removing to a distar :e, would be very unpopular. This is evident from the feeling s manifested by those whom I have sounded on the subject; I have reason, therefore, to believe the scheme would not take with them.

6. As to the Indiars of Marshpee, they are, I think, diminishing, though rather slowly. The proximate cause of diminution is their vices, occasional, I conceive, chiefly by their concern in whaling, and their unavoidable connexion with whites, whose vices they imitate, particularly the sin which most easily besets Indians, an intemperate use of ardent spirits. If industrious and sober, they might live with the greatest comfort, and be respecta-

ble. Their connexion with the State, and with those immediately superintending their affairs, is a very happy one, did they but know the things pertaining to their happiness.

7. At Herring Pond, there are not more than forty people of color. Their territory is considerable; but their affairs are embarrassed, and probably at no distant day, Government will see fit to dispose of their land, and perhaps remove them to Marshpee. I preach to them as often as one sabbath in six or seven. They are fourteen miles from this place. Both at Marshpee and Herring Pond, there is a public allowance from the State for schools. A large proportion of their children live in white families, as servants, and then the stipulation with their masters or mistresses always is, that they be taught to read and write, and frequently to manage domestic affairs, or the occupation of their master or mistress."

The Rev. Mr. Thaxter, the venerable minister of Edgarton, on Martha's Vineyard, writes thus, to Rev. Dr. Holmes, Secretary to the Society for propagating the Gospel among the Indians and others in North America.

"There was, early after the settlement of the Island, much pains taken by the Mayhews to Christianize the Natives. They were remarkably successful. The Natives of Gay Head made a grant of a large tract of land at Gay Head for the express purpose of obtaining instruction for themselves and their children."* After giving some account of their jealousies and disputes about this land, which they now consider as secure in their own hands, he observes: " Were they possessed of common prudence, such are the advantages they enjoy, they might contribute considerable to their own instruction. They are as jealous of one another, as they are of the white people. Those who have no children will not consent that their overseers shall apply any of their income for the instruction of the children of others. I consider the instruction

* This is a tract of land, probably granted by the Indians of this Island many years ago, to the Society in England, for propagating the Gospel in Foreign parts, to enable that Society to extend the means of instruction among our Indians. The revolutionary war interrupted their operations in this country, which have never since been renewed, and this valuable property, it seems, has reverted to the descendants of the Indians, who gave it.

of these poor creatures a object of importance. I have been acquainted with them for near fo ty years, and am fully persuaded, that schooling the childre oug t to be the first object; preaching to them the second. Farm Ne k and Christian Town are trifling objects, compared with say I ead and Chab-aquiddick.† I am often at Chab-aquiddick. They appear thankful for the instruction afforded them. I oft en admonish them to be attentive; that if they are not, I must report them to the Society, and then they will lose their Instructor. They appear to feel it. It is true, we think we see but little good in preaching to these people; did we not take into consideration what evils we probably prevent, who would not be discourage I, and give up the cause, saying, I have labored in vain, and spent my strength for naught? Having put our hands to the plough, we must not look back."

Mr. Baylies, an active and successful Missionary on Martha's Vineyard, 1819, writes to Dr. Holmes: " In my visits (among the Indians on Martha's Vineyard) my feelings are often hurt. *The universal complaint is, " Our children are suffering for want of a school, and we are no able to support one. Can you help us?"* Women schools, superin ended by a man, would be productive of great good." " In my sc ools I had one hundred and thirty-two scholars; one hundred and twenty-two were colored; eleven were married people. In al the schools, I should say, there were one hundred and fif y col red scholars, of both sexes. The Teachers of some of th schools were *colored* men and women. These schools are very pleasing to the Indians." Specimens of writing from seventy of t e Ind an scholars, left with the Secretary, do great honor to t e schools, and furnish good encouragement to their continuance.

Mr. Baylies visited 'roy, was well received by the Indians there, forty-eight in nu ber. They have a decent house with two rooms, one for relig ous worship; the other for a school.

The Legislature of the State has recently granted three hundred dollars to the Indians t Chab-aquiddick, " to build a suitable house for public worshi and a school." The house is built and dedicated. The effect on the Indians is happy, and the prospect of future benefit to them promising.

† An Islan east of the Vineyard.

The facts stated concerning the tribes above enumerated, shew the extent and value of several of their Reservations; evince the dispositions, both of the old and young, in regard to schools; the capacities of their youth to receive instruction; their relation to the government of the states in which they reside; their situation as to civil priviliges; their feelings on the subject of a division of their lands and having individual property; of removal from their present places of abode; in regard to the christian religion and its institutions; and the effects of their connexion and intercourse both with the white and black population around them. These results, of long experience, may be of much value to guide in forming plans, and devising measures, to preserve the remaining Indians from extinction.

### Rhode-Island.

The only Indians remaining in this State are Narragansetts, at Charlestown, forty miles south-west of Providence, over against Block Island. This tribe, at the period of the first settlement of New-England, was one of the most numerous and powerful in all the country, and were long the terror of the English settlers, and of all the tribes around them. The territory which they occupied was extensive. As late as 1744, they were still so numerous, as that in a remarkable revival of religion, under Rev. Mr. Park of Westerly, sixty-four adults were baptized and received into the Church.* Now, their numbers are but four hundred and twenty-nine. Of these, twenty-two were denominated negroes; the rest are of Indian extraction, but are nearly all, if not every individual, of mixed blood and color, in various degrees and shades. Their territory is reduced to about three thousand acres, the joint property of the tribe, and is estimated to be worth about $50,000 or $60,000.

The Society for propagating the gospel among the Indians and others in N. America, support a missionary, and two schools of about fifty scholars, among these Indians, a part of the year.

* Prince's Ch'n. Hist. for 1744.

10

## STATISTICAL TABLES.

No. I.—*A statistical table of all the Indian Tribes within the limits of the United States, including a few bordering on our north and south boundaries, related to, or intermingling with them; exhibiting their homes, the number of souls in each tribe, the places of their residence, with references to the map, and to the pages of this work, pointing to the places of residence of each tribe, on the one, and to the pages in the other, where they are described.*

**INDIAN TRIBES EAST OF THE MISSISSIPPI.**

| | | Names of the Tribes. | No. of souls. | P. in rep. and app. where each tri. is desc'd. Rep | App | Places of Residence and names, &c. |
|---|---|---|---|---|---|---|
| NEW-ENGLAND. | Maine. | 1 St. Johns Indians | 300 | | 64 | On St. John's River, Meductic Point, sixty miles above Fredericktown in N. Brunswick. Supposed to be a mixture of the Esquimaux, with other Indians and white people principally French. |
| | | 2 Passama-quoddies | 379 | | 65 | Pleasant Point, on Scodic r. town of Perry, 5 m. N. of East Port. |
| | | 3 Penobscots | 277 | | 65 | Indian Old town, Penobscot river, 12 m. above Bangor. |
| | Connecticut. R. Isl. Massachusetts. | 4 Marshpee | 320 | | 68 | At Marshpee, 78 m. S. E. Boston, Barnstable Co. |
| | | 5 Herring Pond | 40 | | do. | At Sandwich, 14 m. from Marshpee. |
| | | 6 *Martha's Vineyard | 340 | | do. | Island on the S. coast of Mass. S. E. of Boston. |
| | | 7 Troy | 50 | | do. | In Troy 50 m. S. Boston, Bristol Co. |
| | | 8 Narragansett | 420 | | 73 | In Charlestown 40 m. S. W. of Providence. |
| | | 9 *Mohegan | 300 | | 74 | In Montville, N. London, Co. between N. London and Norwich, on Thames river. |
| | | 10 Stonington | 50 | | 75 | In Stonington, S. E. corner of Connecticut. |
| | | 11 Groton | 50 | | do. | In Groton, adjoining Stonington. |
| | | Total in New-England | 2,526 | | | |
| STATE OF NEW-YORK. | | 12 Montauk Indians | 300 | | 75 | At Montauk Point E. end of Long-Island, N. Y. |
| | | 13 †Brotherton | 400 | 24 | 76 | Near Oneida Lake. |
| | | 14 †Stockbridge | 438 | | 77, 85 | At New-Stockbridge, 7 m. S. of Oneida castle. |
| | | 15 †Oneidas | 1,031 | | 86 | At Oneida castle near Oneida Lake. |
| | | 16 †Tuscaroras | 314 | | 77 | At Lewiston near Lake Ontario. |
| | | 17 Onondagas | 229 | | 323 | In Onondaga Hollow, near Onondaga Lake. |
| | | 18 Senecas and Onondagas | 597 | | 77, 84 87, 93 | On the Alleghany river, bordering on Pennsylvania. |
| | | 19 do. and Delawares | 389 | | do. | At Cattaraugus, in the county of this name, do. |
| | | 20 do.     do. | 340 | | 77, 84 | At Tonawanta, between Batavia and Buffaloe. |
| | | 21 do. Cayugas, & Onondagoes | 700 | | 77, 84 | At Buffalo 3 m. E. of Lake Erie. |
| | | Senecas and a few of other tribes | 456 | | do. | On 5 small Reservations on Genesee river and at Oil Creek. |
| | | Total in New-York | 5,114 | | | |

* The numbers in these tribes are conjectural; no particular account of them having been received.
† These tribes live within the antient limits of the Oneida Territory.

TABLE IV.—*The number of Schools established for the education of Indians.*

| Names of the Tribes, and Schools. | Where located. | When commenced. | By whom—and by whom supported. | No. of scholars. | Allowance of the Gov. of U. States. | Page in Rep. & App. where described. | Remarks. |
|---|---|---|---|---|---|---|---|
| Passamaquod- } dians | Perry, Maine. | About 1821. | Soc. for Prop. Gosp. among Indians N. Amer. & the state and town of Perry. | Not known. | None. | 65 Ap. | |
| Marshpee In- dians, Haring Pond, Troy, | Marshpee, Mass. Near Marshpee. Troy, Mass. | These In- dians have had schools among them for many years. | By the plantation, the state, the Corporation of Harv. Col. & the Soc. for Prop. the Gospel among Indians of N. America. | Not given. | None. | 68 to 71 do. | |
| Martha's Vine- } yard, | T. of Martha's Vineyard, Mass. | Early after the settlement of the island by white peo- ple. | By the Mayhews. The state, Planta- tion, Corp. Harv. Col. & Soc. for prop. Gospel among In- dians in N. Am. | 150 | None. | 71 | The schools here are taught by men and women, white and colored. |
| Narraganseth, | Charlestown, R.I. | Many years ago. | For the last 8 or 10 yrs. principally by the Soc. for Prop. Gospel among In- dians in N. Am. | 50 | None. | 73 | They have two schools. |
| Mohegan, | Mohegan. | Do. | Formerly by mis- sionaries, latterly by the State. | But few. | None. | 74 | |

# INDIAN TREATIES,

### AND

## LAWS AND REGULATIONS

## RELATING TO INDIAN AFFAIRS:

### TO WHICH IS ADDED

## AN APPENDIX,

CONTAINING THE PROCEEDINGS OF THE OLD CONGRESS, AND OTHER IMPORTANT STATE PAPERS, IN RELATION TO INDIAN AFFAIRS.

---

PRINTED AND PUBLISHED UNDER ORDERS OF THE DEPARTMENT OF WAR OF THE 9TH FEBRUARY AND 6TH OCTOBER, 1825.

---

WASHINGTON CITY:

WAY & GIDEON, PRINTERS.

1826.

Indians to be solemnly assured, that the country given them is to be permanently theirs.

System of government to be established.

The favourable effect of these views, if adopted, on the Indians.

Disposition.

Plan for effecting the proposed arrangement.

President to be vested with authority to call a convention.

Additional sum of $10,000 required.

provement, for which they appear to be naturally eminently susceptible. To guard against this evil, so fatal to the race, there ought to be the strongest and the most solemn assurance, that the country given them should be theirs, as a permanent home for themselves and their posterity, without being disturbed by the encroachments of our citizens. To such assurance, if there should be added a system by which the government, without destroying their independence, would gradually unite the several tribes under a simple, but enlightened system of government and laws, formed on the principles of our own, and to which, as their own people would partake in it, they would, under the influence of the contemplated improvement, at no distant day, become prepared, the arrangements which have been proposed would prove to the Indians and their posterity a permanent blessing. It is believed that, if they could be assured that peace and friendship would be maintained among the several tribes; that the advantages of education which they now enjoy would be extended to them; that they should have a permanent and solemn guarantee for their possessions, and receive the countenance and aid of the government for the gradual extension of its privileges to them, there would be among all the tribes a disposition to accord with the views of the government. There are now in most of the tribes, well educated, sober, and reflecting individuals, who are afflicted at the present condition of the Indians, and despondent at their future prospects. Under the operation of existing causes, they behold the certain degradation, misery, and even the final annihilation of their race, and no doubt would gladly embrace any arrangement which would promise to elevate them in the scale of civilization, and arrest the destruction which now awaits them. It is conceived that one of the most cheap, certain, and desirable modes of effecting the object in view, would be, for congress to establish fixed principles, such as have been suggested as the basis of the proposed arrangement, and to authorize the president to convene, at some suitable point, all of the well informed, intelligent, and influential individuals of the tribes to be affected by it, in order to explain to them the views of the government, and to pledge the faith of the nation to the arrangements, that might be adopted. Should such principles be established by congress, and the president be vested with suitable authority to convene the individuals as proposed, and suitable provision be made to meet the expense, great confidence is felt, that a basis of a system might be laid, which, in a few years, would entirely effect the object in view, to the mutual benefit of the government and the Indians, and which, in its operations, would effectually arrest the calamitous course of events to which they must be subject without a radical change in the present system. Should

461

it be thought advisable to call such a convention, as one of the means of effecting the object in view, an additional appropriation of 30,000 dollars will be required; making in the whole, 125,000 dollars to be appropriated.

All of which is respectfully submitted.

**J. C. CALHOUN.**

*To the* PRESIDENT *of the United States.*

for the said convention. Whole amount required, $125,-000.

---

DEPARTMENT OF WAR,
*Office of Indian Affairs, Jan.* 10, 1825.

SIR: I have the honor, herewith, to submit, in compliance with your directions, a table containing a statement of the names of the Indian tribes now remaining within the limits of the different states and territories; the number of each tribe; and the quantity of land claimed by each.

Report of Mr. McKenney, referred to in the preceding report of Mr. Calhoun.

There is no land assigned, as will be seen on reference to the table, to the Indians in Louisiana; yet, it is believed, the Caddoes have a claim, but to what extent is not known. So, also, have the Cherokees, (whose numbers are not known,) to a tract in the northwest corner of the state of North Carolina; which, it is believed, does not exceed 200,000 acres. In New Jersey, Pennsylvania, and perhaps in Maryland, a few Indians are remaining, but how many, or what quantity of land is owned by them, if any, there are no means of ascertaining.

There are now remaining within the limits of the different states and territories, as is shewn by the table, sixty-four tribes and remnants of tribes of Indians, whose " names" and " numbers" are given: who number, in the aggregate, 129,266 souls; and who claim 77,402,318 acres of land.

It will be seen by adverting to the table, that the Indians residing north of the state of Illinois, east of the Mississippi, and west of the lakes, are comprehended in the estimate of the number in Michigan territory; although, in estimating the quantity of land held by Indians in that territory, the portion, only, so held in the peninsula of Michigan, is estimated. It was found impossible, from any documents in possession of this office, to distinguish the number of Chippeways and Ottawas residing in the peninsula of Michigan from those residing on the west side of Lake Michigan. It is, however, believed, that the whole number residing in the peninsula, does not exceed 3,500; and these, as has been stated, are principally of the Chippewa and Ottawa tribes.

It may be proper also to remark, that of the 6,400 Sacs and Foxes who are included in the estimate as part of the 129,266; and who occupy lands on both sides the Mississippi, not more

than one-third of that number are supposed to reside on the east side; and, of the 5,200 Osages, who, by the table, are assigned to Missouri and Arkansas, it is believed, not more than one-third of that number reside within the state of Missouri and territory of Arkansas. If, therefore, the number assumed for the peninsula of Michigan, be correct, and two-thirds of the Sacs and Foxes, as is believed to be the fact, reside on the west of the Mississippi; and two-thirds of the Osages west of Missouri, and north of Arkansas, there will remain " within the limits of the different states and territories,"—confining the Michigan territory to the peninsula—97,354 Indians, possessing, (if the 260,000 acres, which are believed to be claimed by the Cherokees in North Carolina, be added,) 77,602,318 acres of land.

In obtaining this information, resort has been had, for the "names" and "numbers" of the Indian tribes, to the reports to this office, and to other sources of information which are deemed to be the most accurate; and, for the quantity of land claimed by them, to the files of this office; to the general land office; and to computations carefully made from the best maps, by Col. Roberdeau, of the topographical bureau.

The 4,000,000 of acres assumed as the quantity claimed by the Cherokees in Arkansas, although but an estimate, is believed to be near y correct. The precise quantity, however, cannot be ascertained, until it is known how much they ceded on this side the Mississippi, for which, by the treaty of 1817, they are to receive an equal number of acres on the other.

I have the honor to accompany this with a note from Col. Roberdeau, in relation to the difference between his estimate of last year, of the lands claimed in Georgia, and his recent corrected computation of them.

I have the honor to be, very respectfully.

Your most obedient servant.

THOS. L. McKENNEY.

*To the hon. the secretary of war.*

TOPOGRAPHICAL BUREAU.

*January 10th,* 1825.

Estimate of the quantity of lands owned by the Cherokees and Creeks in Georgia.

The quantity of land in the state of Georgia, not ceded to the United States by Indians, was, last year, reported at 10,240,000 square acres; upon a review of the calculations, and having more correct documents than were then referred to, the whole quantity in the state appears to be 9,537,920 acres, of which 5,292,160 are of the Cherokees, and 1,245,760 of the Creeks, as nearly as can be computed.

I. ROBERDEAU,

*Lt. col. Top. Engineers.*

Col. Thos. L. McKenney.
    *Indian department.*

STATEMENT, showing the Names and Numbers of the different Tribes of Indians now remaining within the limits of the several States and Territories, and the quantity of Land claimed by them respectively.

| Names of the tribes. | States or territories in which located. | Numbers of each tribe. | Number in each state or territory. | Numbers of acres claimed by each tribe. | REMARKS. |
|---|---|---|---|---|---|
| St. John's Indians | Maine | 500 | | 100 | No information as to their lands. |
| Passamaquoddies | do | 379 | | 92,160 | |
| Penobscots | do | 277 | 956 | | |
| Mashpee | Massachusetts | 330 | | .... | All the Indians in this state reside on their respective reservations; the places by which they are designated. The quantity of Land occupied by them is not known, nor is there any information in this office by which it can be ascertained. |
| Herring Pond | do | 40 | | .... | |
| Martha's Vineyard | do | 340 | | .... | |
| Troy | do | 50 | 780 | .... | |
| Narragansett | Rhode Island | 500 | 450 | 5,000 | |
| Mohegan | Connecticut | 30 | | 4,000 | |
| Stonington | do | 30 | | 300 | |
| Groton | do | 30 | 400 | | No information as to their lands. |
| Senecas | New York | 2,325 | | | These Indians own and possess together sixteen reservations of land, containing in the whole, according to the report of the agent, on file in this office, about the number of acres stated. |
| Tuscaroras | do | 253 | | | |
| Oneidas | do | 1,136 | | | |
| Onondagas | do | 416 | | | |
| Cayugas | do | 90 | | | |
| Stockbridge | do | 273 | | | |
| Brothertown | do | 360 | | | |
| St. Regis Indians | do | 340 | 5,143 | 216,673 | |
| Nottoway | Virginia | .. | 47 | 27,000 | |
| Catawbas | S. Carolina | .. | 450 | 144,000 | |

## STATEMENT—Continued.

| Names of the tribes. | States or territories in which located. | Number of each tribe. | Number in each state or territory. | Number of acres claimed by each tribe. | REMARKS. |
|---|---|---|---|---|---|
| Ioways | Missouri | 1,100 | . . . | . . . | No information as to the lands claimed by these Indians |
| Osages | Missouri & Arkansas terr. | 5,200 | . . . | ?,??? a?? | The Osages reside partly in Missouri and partly in Arkansas, and the greater portion west of both. Of the lands stated as claimed by them, 4,???,?20 acres are in the former, and 7,5?3,?20 acres in the latter |
| Piankeshaws | do | 207 | . . . | . . . | No information as to their lands. |
| Cherokees | Arkansas terr. | 6,000 | . . . | 4,000,000 | The Cherokees claim about this quantity of land in this territory, under the treaties of 1817 and 1819; the precise quantity not yet ascertained. |
| Quapaws | do | 700 | . . . | . . . | These Indians have recently sold out all their claims, and are about to remove beyond the limits of the territory. |
| Choctaws | do | . . . | . . . | 8,858,560 | Very few or none of this tribe reside in the territory: but they claim in it the quantity of land stated under the treaty of 18th Oct. 1820. |
| | | | 18,017 | | |

## RECAPITULATION.

| States and territories. | Whole number of Indians. | Whole quantity of land claimed. acres. | REMARKS. |
|---|---|---|---|
| Maine | 936 | 12,160 | |
| Massachusetts | 750 | | |
| Rhode Island | 420 | 3,000 | |
| Connecticut | 400 | 4,500 | |
| New York | 5,143 | 216,675 | |
| Virginia | 47 | 27,000 | |
| S. Carolina | 450 | 144,000 | |
| Ohio | 2,250 | 469,501 | |
| Michigan terr. | 28,316 | 7,957,920 | The number of Indians embraces those in the country west of Lake Michigan, as well as those in the peninsula of Michigan; the information being such as not to admit of a separate enumeration. |
| Indiana | | 10,104,800 | Some of the Indians claiming lands in these states reside partly in both; the particular number in either cannot therefore be stated. |
| Illinois | 11,579 | 4,514,360 | |
| Georgia | | 9,559,920 | |
| Alabama | | 7,754,576 | The Indians claiming lands in these states do not all reside in any one of them, except the Chickasaws; and it cannot therefore be stated what is the particular number residing in each state. |
| Tennessee | | 1,055,550 | |
| Mississippi | 53,625 | 15,743,040 | |
| Florida terr. | | | |
| Louisiana | | 4,035,040 | |
| Missouri | 5,000 | 27,084,75 | The Osages and Piankeshaws are scattered in Missouri and Arkansas, and most of the former beyond the limits of either; it cannot therefore be stated what is the particular number of Indians in either. |
| Arkansas terr. | 1,515 | 15,612,560 | |
| | 18,917 | | |
| | 129,356 | 77,402,118 | |

DEPARTMENT OF WAR, *Office Indian affairs, Jan.* 10, 1825.
THOS. L. M'KENNEY.

502

## REGULATING THE INDIAN DEPARTMENT.

[To accompany bills H. R. Nos. 488, 489, & 490.]

MAY 20, 1834.

Mr. H. EVERETT, from the Committee on Indian Affairs, made the following

# REPORT:

*The Committee on Indian Affairs, to which was submitted so much of the President's message as relates to Indian affairs, &c., submit the following report, to accompany the bills by them reported, entitled,*
*" A bill to provide for the organization of the Department of Indian Affairs."*
*" A bill to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." And,*
*" A bill to provide for the establishment of the Western Territory, and for the security and protection of the emigrant and other Indian tribes therein."*

The various subjects submitted to the committee, during the present session, have forced upon their consideration the present state of our Indian affairs, in its three principal relations—the organization of the department; the regulations of trade and intercourse; and the obligations of the United States to the emigrant tribes. These relations, though subjects of different bills, are intimately connected. They are parts of a system ; and of a system which is, itself, also, intimately acquainted with the general legislation of the country. They have, therefore, deemed it proper to present, in the same report, their views on the subjects embraced in the several bills.

The committee are aware of the intrinsic difficulties of the subject—of providing a system of laws and of administration, simple and economical, and, at the same time, efficient and liberal—that shall be suited to the various conditions and relations of those for whose benefit it is intended ; and that shall, with a due regard to the rights of our own citizens, meet the just expectations of the country in the fulfilment of its proper and assumed obligations to the Indian tribes. Yet, so manifestly defective and inadequate is our present system, that an immediate revision seems to be imperiously demanded. What is now proposed is only an approximation to a perfect system. Much is necessarily left for the present to Executive discretion, and still more to future legislation.

The Indian country, to which the bills reported refer, will include all the territory of the United States west of the Mississippi, not within Louisiana,

[Gales & Seaton, print.]

88 ·     **[ Rep. No. 474. ]**

TABLE 3.—*The tribes east of the Mississippi, and below N. lat. 46°. who have not yet agreed to remove west of the Mississippi.*

| Names. | Numbers. | Remarks. |
|---|---|---|
| Indians of New England · · · | 2,526 | |
| "     New York · · · | 5,774 | |
| "     Virginia · · · | 47 | |
| "     South Carolina · · · | 450 | |
| Tribes.   Wyandots, O. · · · | 527 | |
| "     Ottawas, O. · · · | 250 | |
| "     Miamies · · · | 1,100 | |
| "     Menomonies · · · | 2,143 | |
| | 12,817 | |
| "     Chippewas, M. T. · | 3,000 | These Indians have been provided with a home west of the Mississippi, when they choose to remove to it. |
| "     Ottawas,   do · | | |
| "     Winnebagoes · · | 4,591 | |
| "     Cherokees, east, in the States of Tennessee, North Carolina, Georgia, and Alabama · · | 10,000 | |
| Total, | 30,408 | |

TABLE 4.—*This table exhibits a summary and digest of what has been presented in the preceding tables.*

| Tribes. | Numbers. | Square miles. | No. of acres. |
|---|---|---|---|
| Indigenous tribes west of Missouri · · · | 22,496 | 49,220 | 31,500,800 |
| Indigenous tribes north of Missouri and their lands, including the Winnebago country · · · | 5,602 | 17,652 | 11,304,000 |
| Emigrant Indians · | 25,837 | | |
| The Indians who have agr'd to emigrate, or submit to State laws · · · | 41,466 | 83,603 | 53,506,000 |
| The Indians that have lands assigned them west of the Mississippi, but have not yet agreed to remove to them · · · · | 17,591 | | |

[ Rep. No. 474. ]    89

TABLE IV—Continued.

| Tribes. | Numbers. | Square miles. | Acres. |
|---|---|---|---|
| The Indians in the several States who have not yet agreed to remove, and to whom no lands have been assigned - - - | 12,817 | | |
| Unappropriated lands west of Missouri and W. long. 17° 30' to 23° - - - | - | 52,777 | 33,771,180 |
| Unappropriated lands north of the State of Missouri | - | 1,680 | 1,075,200 |
| | 125,806 | 201.342 | 128.859.280 |

The estimates in the foregoing tables are made up from the best sources of information. As it respects the number of souls in the different tribes, it will probably be found too high rather than too low, as the Indians generally have been greatly overrated. The quantity of land stated to belong to them, in cases of the emigrant Indians, is fixed by treaty stipulations, and therefore, accurately given; that of the indigenous tribes is only a general estimate, but it is believed it will fall within rather than overrun the real quantity claimed by them.

From the exhibit as presented by the tables, it appears that the whole number of Indians intended to reside in the Indian territory, (should all below N. lat. 46° remove from the east to the west of the Mississippi,) will amount to 125,806 souls; and the quantity of land set apart for them is 201,342 square miles! that is, more than one and a half square mile to every soul. And even the emigrants have assigned to them a country, equal, on an average, to a square mile for every individual. So that it is presumed there can be no question but that they have a sufficient quantity secured to them for their accommodation.

The commissioners accompany this report with a map of the Indian country; which, although it may not be found perfectly accurate, yet it is more so than any other published, and will serve to exhibit the relative position of the several nations, and the boundaries of their respective countries. In the appendix, C, will also be found a particular description of the boundary lines of their lands, with a few general remarks concerning them. The above description and the map will point out where the unappropriated land, amounting to 54,451 square miles, is situated; and the commissioners will now suggest how it can be disposed of, in order to accommodate those Indians still east of the Mississippi for whom no provision has yet been made, or any others whom it may, hereafter, be deemed important to settle on the Missouri river.

The lands from Red river to the north line of the Osage, Quapaw, and Seneca countries, have all been assigned; and the first district of unappropriated lands is between this line and the lands of the Weas. Shawnees, and Kanzas, and is estimated to contain 20,252 square miles, or

12

# HISTORICAL

### AND

# STICAL INFORMATION

#### RESPECTING THE

## RY, CONDITION AND PROSPECTS

#### OF THE

## AN TRIBES of the UNITED STATES

*Collected and prepared under the*
direction of the **BUREAU OF INDIAN AFFAIRS** per act of Congress
*of March 3rd 1847.*

**BY HENRY R. SCHOOLCRAFT L.L.D.**

Illustrated by
**S. EASTMAN, CAPT. U. S. ARMY.**

MASSACHUSETTS STATE LIBRARY.

Published by authority of Congress.

## Part I.

PHILADELPHIA:

LIPPINCOTT, GRAMBO & CO

# 7. ULTIMATE CONSOLIDATED TABLES OF THE INDIAN POPULATION OF THE UNITED STATES.

| Names of Tribes. | Number in Tribe. | Total Population. | Names of Tribes. | Number in Tribe. | Total Population. |
|---|---|---|---|---|---|
| **TABLE I.**—Tribes whose Vital and Industrial Statistics have been taken by Bands and Families, under the direction of the Act of Congress. | | | Brought forward............ | 98,600 | 217,746 |
| | | | Caddoes.......................... | 2,600 | |
| A. Iroquois Group.............. | 5,922 | | Chippewas. (See *Algonquin Group.*) | | |
| B. Algonquin Group*........... | 17,197 | | Chippewas, west, and Red River, north ....................... | 1,500 | |
| C. Dacota Group*.............. | 6,570 | | Crees. (None in the United States.) | | |
| D. Appalachian Group* ........ | 5,015 | | Chawas. (See *Cheyennes.*) | | |
| | | 34,704 | Cayugas. (See *Iroquois Group.*) | | |
| | | | Cayugas and Iroquois, west...... | 30 | |
| **TABLE II.**—Tribes of the new States and Territories South and West, including the Acquisitions from Mexico under the Treaty of Guadalupe Hidalgo. | | | Diosondulies. (See *Wyandotts.*) | | |
| | | | Dacotas. (See *Sioux.*) | | |
| | | | Delawares...................... | 1,500 | |
| A. Indian Population of Texas. | 24,100 | | Eutaws. (See *Utahs.*) | | |
| B. Indian Population of New Mexico ...................... | 92,130 | | Foxes and Sacs ................. | 2,100 | |
| | | | Folle Avoines. (See *Menomonies.*) | | |
| C. Indian Population of California .......................... | 32,231 | | Florida Indians. (See Table 2.) | | |
| D. Indian Population of Oregon. | 22,733 | | Flatheads. (See *Oregon.*) | | |
| E. Indian Population of Utah... | 11,500 | | Gros Ventres................... | 3,000 | |
| F. Indian Population of Florida | 348 | | Green Bay Indians. (See *Menomonies* and *Oneidas.*) | | |
| | | 183,042 | Iowas. (See *Dacota Group.*) | | |
| | | | Kiowas......................... | 2,000 | |
| | | | Kickapoos ...................... | 600 | |
| **TABLE III.**—General Schedule of the Tribes located East of the Rocky Mountains and the Line of the Mississippi, in high northern latitudes; all of whom, together with those named in Table No. 2, remain to be enumerated, under the operation of the Indian Census in progress. | | | Kanzas......................... | 1,000 | |
| | | | Kaskaskias ..................... | 200 | |
| | | | Menomonies..................... | 2,500 | |
| | | | Mandans........................ | 300 | |
| | | | Miniturees..................... | 2,500 | |
| | | | Miamies ........................ | 500 | |
| Alabamas. (See *Muskogees.*) | | | Missouris....................... | 500 | |
| Assinaboins, south of lat. 49°... | 1,000 | | Mohawks. (See *Iroquois Group.*) | | |
| Apaches. (See *Texas, New Mexico,* and *Utah.*) | | | Munsees........................ | 200 | |
| | | | Ottowas. (See *Algonquin Group.*) | | |
| Arapahoes...................... | 3,500 | | Ottowas, west.................. | 300 | |
| Absarokes, or Crows............ | 4,000 | | Otoes.......................... | 500 | |
| Aurickarees.................... | 1,500 | | Omahas......................... | 2,000 | |
| Blackfeet...................... | 13,000 | | Oneidas. (See *Iroquois Group.*) | | |
| Blood Indians (few reach the Missouri)...................... | 500 | | Onondagas. (See *Iroquois Group.*) | | |
| Brothertuns.................... | 600 | | Ogullahs....................... | 1,500 | |
| Cherokees...................... | 26,000 | | Pawnees........................ | 17,000 | |
| Creeks......................... | 25,000 | | Poncas......................... | 700 | |
| Chickasaws (not enumerated) ... | 5,000 | | Pottawatomies.................. | 3,200 | |
| Choctaws....................... | 18,000 | | Peorias........................ | 150 | |
| Comanches. (See *Texas.*) | | | Piegans. (See *Satsika, Blood,* and *Blackfeet.*) | | |
| Cheyennes...................... | 2,500 | | Piankeshaws.................... | 200 | |
| Carried forward............ | 98,600 | 217,746 | Carried forward............ | 145,480 | 217,746 |

* The census, in these groups, has been carried no farther, but is in progress.

| Names of Tribes. | Number in Tribe. | Total Population. | Names of Tribes. | Number in Tribe. | Total Population. |
|---|---|---|---|---|---|
| Brought forward............ | 145,480 | 217,746 | Brought forward............ | 956 | 385,076 |
| Quappas........................ | 400 | | MASSACHUSETTS— | | |
| Ricarees. (See *Aurickarees*.) | | | Marshpee................... | | |
| Shawnees....................... | 1,600 | | Chippaquadic.............. | | |
| Sioux of the Mississippi (not enumerated in No. 1)....... | *6,000* | | Gay Head................... | | |
| Sioux of the Missouri (not enumerated in No. 1).......... | 5,500 | | Assonets of Troy or Fall River. | | |
| Satsika. (See *Blackfeet*, &c.) | | | Herring Pond ............. | | 847 |
| Stockbridges................... | 400 | | Hassanamico............... | | |
| Senecas. (See *Iroquois Group*.) | | | Punkapog.................... | | |
| St. Regis Tribe. (See *Iroquois Group*.) | | | Natic ....................... | | |
| Seminoles...................... | 1,500 | | Dudley ..................... | | |
| Senecas and Shawnees. (See *Iroquois Group*.) | | | Grafton..................... | | |
| Swan Creek and Black River Chippewas (not enumerated in Algonquin Group).......... | 200 | | Yarmouth................... [All mixed with the African race but 8 or 10.] | | |
| Snakes. (See Table 2.) | | | RHODE ISLAND— | | |
| Shoshonees. (See Table 2.) | | | Narragansetts............. | 420 | |
| Tetaus......................... | 3,000 | | CONNECTICUT— | | |
| Tonewandas. (See *Iroquois Group*.) | | | Mohegans at Mohegan.......... | 300 | |
| Utahs. (See Table 2.) | | | Mohegans at Stonington........ | 50 | |
| Wyandots. (See *Iroquois Group*.) | | | Mohegans at Groton............ | 50 | |
| Winnebagoes. (See *Dacota Group*.) | | | NEW YORK— | | |
| Weas........................... | 250 | | Iroquois. (See *Iroquois Group*.) | | |
| Yanktons. (See *Sioux of the Missouri*.) | | | Algonquins, not enumerated in Algonquin Group ......... | 40 | |
| | | 167,330 | VIRGINIA— | | |
| | | | Nottoways, mixed with the African race.................. | 40 | |
| TABLE IV.—Fragmentary Tribes still existing within the Boundaries of the old States. | | | SOUTH CAROLINA— | | |
| | | | Catawbas...................... | 200 | |
| MAINE— | | | NORTH CAROLINA— | | |
| Souriquois of St. Johns......... | 300 | | Catawbas...................... | 250 | |
| Passamaquoddies................ | 879 | | Cherokees. (See Table 1.) | | |
| Penobscots..................... | 277 | | Total in old States............ | 3,153 | 3,153 |
| | 956 | | | | |
| Carried forward.............. | | 385,076 | Grand Total.................. | ......... | 388,229 |

[There may, in addition to these numbers, be from 25,000 to 35,000 Indians, within the area of the unexplored territories of the United States.]

HENRY R. SCHOOLCRAFT,

Agent Census, &c., Act of March 3, 1847.

APPROVED,

L. LEA,

Commissioner Indian Affairs.

OFFICE INDIAN AFFAIRS,
JULY 22, 1850.