State of NEW YORK, New York State Racing and Wagering Board, and New York State Department of Environmental Conservation, Plaintiffs,

v.

The SHINNECOCK INDIAN NATION, Charles K. Smith, II, James W. Eleazar, Jr., Lance A. Gumbs, and Fred Bess, Defendants.

No. CV–03–3243(TCP)(ARL).

United States District Court,
E.D. New York.

Aug. 29, 2003.

See also 274 F.Supp.2d 268.

George Hammarth, Assistant Attorney General, Hauppauge, NY, for New York State Department of Environmental Con-

servation, New York State Racing and Wagering Board, State of New York.

Christopher H. Lunding, Cleary, Gottlieb, Steen & Hamilton, New York City, for The Shinnecock Indian Nation, Charles K. Smith, II, Fred Bess, James W. Eleazar, Jr., Lance A. Gumbs.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court is a motion brought by plaintiffs State of New York, New York State Racing and Wagering Board, and New York State Department of Environmental Conservation (collectively "the State" or "Plaintiffs") as against defendants the Shinnecock Indian Nation, Charles K. Smith, II, James W. Eleazar, Jr., Lance A. Gumbs, and Fred Bess (collectively "the Shinnecock Nation" or "Defendants") for an order granting a preliminary injunction prohibiting Defendants from (1) taking any steps whatsoever to build or construct any structure on the parcel of land know as Westwoods in the community of Hampton Bays, Town of Southampton, New York; (2) operating in the State of New York the game of bingo, slot machines or any other form of gambling in violation of State law; (3) advertising the holding of such gambling; (4) ordering or purchasing any supplies for the operation of such gambling; (5) opening, leasing or making available any building at Westwoods for such gambling; and (6) providing transportation for persons with the opportunity to engage in the subject gambling, or otherwise facilitate or assist with the holding or operation of such gambling.

For the reasons stated below, Plaintiffs' motion for a preliminary injunction is hereby GRANTED, and Defendants must immediately cease and desist from engaging in all activities listed above. Furthermore, this action is hereby stayed for period of 18 months.

## BACKGROUND

The Shinnecock Nation is, and has been, recognized as an Indian tribe by the State of New York for more than 200 years. The Shinnecock Nation has offices, and is otherwise located, at the Shinnecock Indian Reservation, within the Town of Southampton, County of Suffolk. The individual defendants are four tribal officials of the Shinnecock Nation sued in their official capacity.

The Shinnecock Nation is the owner of certain real property located in the Town of Southampton in the community of Hampton Bays ("Westwoods" or "the Property"). Westwoods, a 79–acre site, consists of two (2) contiguous lots running north-south, bisected by Newtown Road, bounded to the north by the Great Peconic Bay and to the south by Sunrise Highway. The Property is not located within the Shinnecock Indian Reservation recognized by the State. However, Defendants claim they retain "aboriginal" or "Indian" title to Westwoods because the Property allegedly consists of tribal land historically controlled by the Shinnecock Nation.

The Shinnecock Nation has proposed building a gambling facility at Westwoods. Defendants planned to commence construction of this casino on June 30, 2003 by "clearing brush, removing trees, and grading the portions of the Westwoods Parcel where the [casino] is contemplated to be constructed." (Answer ¶ 52.) On June 30, the Shinnecock Nation allegedly held a groundbreaking ceremony at Westwoods, and thereafter, on July 12, 2003, Defendants began using a bulldozer to clear trees and grade land located on the Property. Plaintiffs allege approximately five (5) acres of land were cleared in preparation for construction of a gambling facility.

Plaintiffs claim the contemplated facility will include "as many as 1,000 slot machines, more than 100 gaming tables, a food court, an entertainment stage, and a high-stakes bingo hall." (Compl.¶50.)[1] The proposed casino will allegedly consist of a 65,000 square-foot gaming facility and will attract millions of visitors every year.

According to an affidavit from the Deputy Regional Director in the Eastern Region of the Bureau of Indian Affairs, the Shinnecock Nation is not a "federally" recognized Indian tribe. (Pogue Aff. ¶2.) Furthermore, the Director averred that Westwoods is not considered Indian land, because it is neither a federal Indian reservation nor is it land held in trust by the United States for an Indian tribe. (*Id.* ¶3.) Although the Shinnecock Nation did petition for federal recognition in 1978, that recognition has not yet been granted by the federal government. The parties dispute whether Defendants' application to the BIA remains incomplete or whether it was in fact recently completed.

On Sunday, June 29, 2003, the State obtained a Temporary Restraining Order ("TRO"), signed by New York State Supreme Court Justice Edward D. Burke, restraining Defendants from taking any steps to develop a casino on the Property. Plaintiffs served the Shinnecock Nation on June 29 and filed the action ("the State Action") on Monday, June 30. On July 1, Defendants removed the State Action to this Court.

On July 10, 2003, Plaintiffs brought an order to show cause requesting, *inter alia,* an extension of the State-imposed TRO and a preliminary injunction. The parties appeared before this Court on July 11, to discuss the merits of the TRO. Given questions that remained regarding defects in personal service on the individual defendants, this Court denied Plaintiffs' motion. Subsequently, Plaintiffs cured any alleged defect in personal service by serving Defendants' counsel, who was properly authorized by his clients to accept service.

On July 21, 2003, Plaintiffs brought two Orders to Show Cause moving for: (1) remand of the action to State court; and (2) a preliminary injunction, which is the subject of the instant motion. The parties appeared before this Court on July 25 for oral argument on the State's motion to remand. At oral argument, Defendants voluntarily agreed to halt all development on the Property until August 1, 2003 to allow this Court time to decide the State's remand motion. This Court subsequently denied the State's motion to remand on July 29, reserving judgment on the preliminary injunction motion. *State of New York v. Shinnecock Indian Nation,* 274 F.Supp.2d 268, 270, 2003 WL 21786024, at *2 (E.D.N.Y.2003).

On July 30, 2003, the parties again appeared before this Court, this time for oral argument on the State's motion for a preliminary injunction. In lieu of a hearing, both sides stipulated to a decision on the papers previously submitted to this Court.[2]

---

**1.** Defendants admit only that the proposed casino will have the capacity to hold between 900 and 1,000 gaming machines and 60 table games. (Answer ¶50.)

**2.** In addition to the motion papers submitted by Plaintiffs and the Shinnecock Nation, this Court also considers herein papers submitted by the Town of Southampton ("the Town") in support of the State's motion for a preliminary injunction. A parallel action had been

commenced by the Town against Defendants in State court on July 14, 2003 ("the Town Action"), after Defendants began clearing and grading land on the Property. The Complaint in the Town Action alleges violations of Town zoning laws, and the Town successfully obtained a TRO from the State court enjoining Defendants from further developing the Property. On July 15, Defendants removed the Town Action to this Court. *See Town of*

Furthermore, Defendants agreed to continue the self-imposed stay on development of the Property until August 29, 2003.

## DISCUSSION

### A. Standard for Preliminary Injunction

 The purpose of a preliminary injunction is to maintain the *status quo* until there can be a determination on the merits of the action. *Sierra Club v. U.S. Army Corps of Engineers,* 732 F.2d 253, 256 (2d Cir.1984). The requirements for obtaining a preliminary injunction in this Circuit are well-settled.

> Preliminary injunctive relief is appropriate when a plaintiff establishes "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [plaintiff's] favor."

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 108 (2d Cir.2003) (quoting *TCPIP Holding Co., Inc. v. Haar Communications, Inc.,* 244 F.3d 88, 92 (2d Cir.2001)).

 The decision to grant injunctive relief " 'rests in the discretion of the district court which, absent an abuse of discretion, will not be disturbed on appeal.' " *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). Plaintiffs have met the standard for obtaining a preliminary injunction from this Court.

### 1. Irreparable Harm

 Before a court may consider the other requirements for a preliminary injunction, the movant must first make a showing of irreparable harm, which "is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction.' " *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983)). To establish irreparable harm, "[a] moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995) (citing *Reuters,* 903 F.2d at 907).

The State and Town have shown likely irreparable harm resulting from the construction of a gambling casino at Westwoods without adherence to State and local laws. First and foremost, the construction of a casino like the one proposed by Defendants would cause incredible traffic congestion in the surrounding community. The local roads in the area are not sufficient to handle the present traffic congestion, much less the number of vehicles estimated to travel to the proposed gambling facility. This increased traffic would not only effect the quality of life of residents in an already crowded area, it is also

*Southampton v. The Shinnecock Indian Tribe, et al.,* 2003 Civ. 3466(TCP)(ARL). On July 25, 2003, the Town moved, via Order to Show Cause, to remand the Town action to State court. In order to streamline the course of these two actions, this Court agreed to hold the Town's motion to remand in abeyance and permitted the Town to submit papers in support of the State's preliminary injunction motion, without prejudice to the Town's motion to remand. The Town filed a Memorandum of Law in Support of the State's motion for a preliminary injunction on August 8, 2003. Defendants were permitted to file a Supplemental Memorandum of Law in Opposition to Plaintiffs' motion for a preliminary injunction and did so on August 18, 2003.

likely to drastically heighten air pollution along Routes 25 and 27.

Secondly, the State and Town provide evidence showing the possible harm to the fragile natural environment in the area if Defendants do not adhere to State and local environmental regulations when building any large facility on the Property. For instance, Plaintiffs allege the Property is not connected to a public waste water treatment plant and claim Defendants will need to install a waste water treatment plant on the Property. (Hammarth Aff. ¶ 6.) Any such on-site plant will, of necessity, discharge its effluent into both the Great Peconic Bay and Suffolk County's ground waters, the latter of which is the sole source of drinking water for the surrounding population. (*Id.* ¶ 9.)

Defendants counter that Plaintiffs' contentions are false and that the Property is positioned to connect directly to a municipal water main that lies nearby. (Provenzano Aff. ¶ 6, Ex. D.) Defendants also argue that Westwoods is not located in an environmentally fragile area and that any construction at Westwoods will conform to necessary State environmental law and Town zoning regulations.

The purpose of State water pollution laws, the State Environmental Quality Review Act ("SEQRA")[3] and applicable Town ordinances is to protect the natural environment and water supply of the State, Suffolk County, and the Town of Southampton. By failing to agree to a SEQRA review or gain the necessary permits regarding building and fire codes, property access, parking, lighting, drainage, public utilities and noise impacts, there is no assurance, other than Defendants' own contentions, that State and lo-

cal environmental laws will be followed. If Defendants fail to abide by State and Town environmental regulations, the likely harm to the pristine community of Southampton could be devastating. Importantly, such harm could not be alleviated by money damages alone.

The third type of irreparable harm posited by Plaintiffs would result from Defendants' alleged violation of State anti-gambling laws. The State argues that New York's gambling regulations are designed to protect the health and safety of the public from the negative effects of gambling, particularly links to organized crime. Robert T. Williams, Assistant Counsel to the New York State Racing and Wagering Board, testified that Defendants are not permitted under State law to open a gaming facility like the one proposed, because the Shinnecock Nation does not qualify as an organization authorized to conduct bingo gaming or games of chance under Gen. Mun. Law §§ 188(1), 477 or 479(1). (Williams Affirm. ¶¶ 5–6, 10–11.) Plaintiffs argue that the proposed violations of the State's criminal laws and public policy against gambling constitute irreparable harm to members of the public.

Finally, the potential irreparable harm to the public discussed above is certainly imminent, as the Shinnecock Nation has made clear its intentions to begin constructing the gaming facility immediately. This imminency is further supported by the fact Defendants commenced a groundbreaking ceremony on June 30, 2003 and began clearing multiple acres of land.

Incredibly, the Shinnecock Nation argues that Plaintiffs have failed to exhibit any irreparable harm resulting from the

---

**3.** "SEQR[A] requires that all agencies determine whether the actions they directly undertake, fund or approve may have a significant impact on the environment, and, if it is determined that the action may have a significant adverse impact, prepare or request an environmental impact statement." 6 N.Y.C.R.R. § 617.1(c) (2003).

construction of a casino at Westwoods. Instead, Defendants contend they are the ones who would suffer harm if this Court were to grant the State's motion for preliminary injunction. The Shinnecock Nation, the members of which are desperately in need of better housing, jobs, and education, claim a delay in construction of the casino would force Defendants to suffer irreparable injury. Although the Shinnecock Nation could no doubt use the vast revenues that the proposed casino would likely generate, unlike Plaintiffs' alleged damages, Defendants' alleged damages are fully compensable, as they are monetary in nature.

The potential impact of a casino at Westwoods on the environment and quality of life of the surrounding communities would no doubt be immense. At this early stage in the litigation, the State and Town have successfully argued that the harm suffered by the community is imminent and would be irreparable in nature should the casino be built. Therefore, Plaintiffs have met the first requirement for acquiring a preliminary injunction from this Court.

## 2. Likelihood of Success on the Merits or Sufficiently Serious Questions to be Litigated

Plaintiffs have also met the second requirement for a preliminary injunction by proving either: (1) likelihood of success on the merits or (2) the presence of sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in favor of the moving party. *TCPIP Holding Co.*, 244 F.3d at 92.

The Supreme Court addressed a state's ability to regulate Indian gambling in the paramount case *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In that case, the Court allowed two federally recognized tribes in California to conduct high-stakes bingo on their reservation even though such activity violated California law. Congress, in response to *Cabazon*, enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq.*, in 1988. IGRA outlines which tribes may conduct gaming in the United States, where such gaming may occur, and the types of gaming that may occur. Pursuant to IGRA, high-stakes bingo and slot machines—the type of gaming contemplated by the Shinnecock Nation—may only be conducted by an Indian tribe on lands that the federal government defines as Indian lands, unless the state otherwise permits such activity. 25 U.S.C. § 2710(d)(1). For the purposes of IGRA, an Indian tribe is one that has been recognized as such by the federal government. 25 U.S.C. § 2703(5)(A). Furthermore, Indian lands include:

(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).

As discussed above, Defendants are not permitted to conduct bingo gaming or games of chance under New York law. There is no exception under Article I, Section 9 of New York State Constitution or State gambling laws that allows a state-recognized Indian tribe to conduct gaming in New York. Likewise, there is no dispute that the Shinnecock Nation may not conduct gaming pursuant to IGRA, given that Defendants are not an Indian tribe within the meaning of the statute, and the Property does not constitute Indian land, as

defined by federal statute. *First Am. Casino Corp. v. Eastern Pequot Nation*, 175 F.Supp.2d 205, 208 (D.Conn.2000) ("IGRA does not apply because [the state-recognized tribe] has not attained formal federal recognition and therefore is not an 'Indian tribe' within the meaning of IGRA. Unless and until defendant obtains federal acknowledgment, its activities are not regulated by IGRA."). Defendants argue, however, that the Shinnecock Nation is not only an Indian tribe recognized by the State and occupying a State Indian reservation but is also an Indian tribe that purportedly pre-existed the founding of the Republic. Thus, Defendants claim they are sovereign as to and against any and all State and local regulations.

To invoke the sovereign immunity defense, an entity must, of course, be a sovereign. The Supreme Court has held that federally recognized Indian tribes are subject to suit only when Congress has authorized the suit or the tribe has specifically waived its immunity. *Kiowa Tribe of Oklahoma v. Mfg. Technologies, Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). Likewise, "tribal immunity is a matter of federal law and is not subject to the diminution by the States." *Id.* at 756, 118 S.Ct. 1700. Therefore, in order for this Court to ascertain whether the Shinnecock Nation may construct a casino on the Property under the theory proffered by Defendants, a determination must be made as to the tribal status of the Shinnecock Nation and its right to invoke a defense of sovereign immunity.

The United States has historically determined that certain groups of Indians are recognized as sovereigns under the Indian Commerce Clause of the United States Constitution, which grants Congress the power "[t]o regulate Commerce...with the Indian Tribes." U.S.C.A. Const. Art. I, § 8, cl. 3. Traditionally, Indian tribes were recognized as such through interactions with, or official statements by, the federal government, such as treaties. *See* Mark D. Myers, Federal Recognition of Indian Tribes in the United States, 12 Stan. L. & Pol'y Rev. 271, 272–274 (2001) (detailing history of federal recognition of Indian tribes); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 56–57 (2d Cir.1994) (same). In the early 1800s, Congress began delegating to the Executive Branch the authority to manage Indian affairs via the Department of the Interior and in 1834 created the Department of Indian Affairs, predecessor to the modern-day Bureau of Indian Affairs ("BIA"). *Golden Hill*, 39 F.3d at 57 (citations omitted). For much of the twentieth century, the BIA considered applications for federal recognition on a case-by-case basis, but this proved to be an unwieldy process. *Id.* Therefore, in 1978, the Department of the Interior promulgated regulations establishing a uniform means for acknowledging tribes as Indians. 25 C.F.R. §§ 83.1–83.13.

In determining tribal status of an applicant group, the BIA requires a showing that, *inter alia:* (a) the group "has been identified as an American Indian entity on a substantially continuous basis since 1900"; (b) "[a] predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; and (c) the group "has maintained political influence or authority over its members as an autonomous entity from historical times until the present." 25 C.F.R. § 83.7. "Under these regulations recognition creates a government-to-government relationship between the tribe and the United States, and makes the tribe eligible for those services and benefits available to other federally recognized tribes." *Golden Hill*, 39 F.3d at 57 (citing 25 C.F.R. § 83.2).

The Shinnecock Nation has petitioned the BIA for federal recognition of their tribal status. According to a December 22, 1998 letter from the BIA to the then-trustees of the Shinnecock Nation ("the BIA Letter"), in 1978 the BIA received a letter of intent to petition for "Federal acknowledgment as an Indian tribe" on behalf of "the Shinnecock Tribe." (Cohen Aff., Ex. 21, at 1.) The BIA Letter indicated that Defendants' pending application was incomplete and outlined several "significant omissions in [the] petition...." (*Id.* at 2.) Plaintiffs and the Town contend that as of the date of the instant motion, Defendants have failed to complete their petition to the BIA for federal recognition. Defendants, however, have indicated their application was in fact very recently completed.

Defendants, citing *Oneida Indian Nation v. Oneida Co., N.Y.*, 414 U.S. 661, 674, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), admit that issues of sovereignty and immunity of Indian tribes are matters of federal law. However, instead of looking to the BIA's Congressionally-delegated power to determine which groups constitute Indian tribes, Defendants rely on the standard established by the Supreme Court in 1901 in *Montoya v. United States*, 180 U.S. 261, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901). In *Montoya*, the Court held that the attributes of a tribe are: (1) a body of Indians of the same race; (2) united in a community; (3) under one leadership; and (4) inhabiting a particular territory. *Id.* at 266, 21 S.Ct. 358. Using the framework set out in *Montoya*, Defendants argue that this Court has the authority to rule on the status of the Shinnecock Nation as an Indian tribe entitled to sovereign immunity.

The Second Circuit in *Golden Hill* discussed the interplay between the *Montoya* definition and the BIA criteria for recognizing Indian tribes.

The two standards overlap, though their application might not always yield identical results. A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. Where a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track—although at different times—to attain the statute's ends by their coordinated action.

*Golden Hill*, 39 F.3d at 59.[4]

In *Golden Hill*, the plaintiff was recognized by the State of Connecticut as a tribe but was not federally recognized. Like the Shinnecock Nation, the group in *Golden Hill* made an application to the BIA but failed to complete at least some of the supporting documentation for over a decade. *Id.* at 55.

Given the pending status of the plaintiff tribe's application to the BIA in *Golden Hill*, the Second Circuit found that courts should defer to the expertise and experience of the BIA in implementing its uniform procedures to determine tribal status. *Id.* at 59–60.

[T]he judicial hand should be stayed pending reference of plaintiff's claims to the [BIA] for its views. *A federal court, of course, retains final authority to rule on a federal statute, but should avail itself of the agency's aid in gathering facts and marshalling them into a meaningful pattern.* As a consequence,

---

**4.** Although *Golden Hill* addressed the specific question of the right of a state-recognized tribe to bring an action under the Noninter-course Act, 25 U.S.C. § 177, the Second Circuit's discussion of federal recognition of Indian tribes is applicable to the case at bar.

under the present circumstances, the BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether [the state-recognized tribe] meets the criteria for tribal status. This is a question at the heart of the task assigned by Congress to the BIA and should be answered in the first instance by that agency.

*Id.* at 60 (emphasis added) (citations omitted).

As detailed above, Plaintiffs have satisfied the second prong of the preliminary injunction standard. There is some question as to Plaintiffs' likelihood of success on the merits, given the uncertainty of Defendants' tribal status and thus their sovereign immunity claim. However, in order to satisfy this part of the preliminary injunction test, the moving party need "not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985), *rev'd on unrelated grounds, O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Plaintiffs have certainly met this standard.

Regardless, there are clearly sufficiently serious questions presented—namely Defendants' arguments that they are exempt from all State and local environmental and zoning regulations—that go to the merits of the case and make them fair grounds for litigation. *See TCPIP Holding Co.,* 244 F.3d at 92. At this time, the Shinnecock Nation has been recognized as an Indian tribe under New York State law only. Defendants claim that "[t]he Shinnecock Nation's existence as a tribe is a function of its status as a 'separate sovereign[ ] pre-existing the Constitution' that has retained its 'original natural rights in matters of local self-government.'" (Defs.'

Supp. Mem. at 11) (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55–56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (internal quotations omitted)). However, that fact, in addition to the problem of tribal status, is the very question at issue in this case.

In addition, the Town argues that the Westwoods property may not be claimed by the Shinnecock Nation under the theory of Indian or aboriginal title, because the Property was abandoned, surrendered or conveyed to the Town by Defendants, only to be reacquired by the Shinnecock Nation at a later date. This issue also presents a fair ground for litigation in that it involves complicated factual and historical issues that must be fleshed out and decided at trial.

█ Furthermore, the balance of hardships tips decidedly in favor of the moving party. *See TCPIP Holding Co.,* 244 F.3d at 92. The likely harm stemming from the construction of a gambling facility to the natural environment and the communities surrounding Westwoods is immense. Conversely, the revenue lost by the Shinnecock Nation, although possibly quite large, is not irreparable, given that it is compensable through monetary damages. Therefore, the potential harm to Plaintiffs and the Town clearly outweighs the potential harm to Defendants.

As in *Golden Hill,* the BIA's resolution of the factual issues relating to Defendants' tribal status will be of considerable assistance to this Court in ultimately deciding the sovereign status of the Shinnecock Nation. However, the undersigned shares the Second Circuit's concern regarding the undue delay of litigation while Defendants' petition for federal recognition is pending before the BIA. Therefore, this Court follows the lead of *Golden Hill* and grants a stay of this action for a period of 18 months. *See Golden Hill,* 39 F.3d at 60–61. This 18–month time period will be

measured from the time Defendants' petition is deemed complete by the BIA. If, after that time, the BIA has not ruled on the tribal status of the Shinnecock Nation, the BIA or Plaintiffs shall be provided an opportunity to show why the stay should not be dissolved. If the BIA or Plaintiffs fails to make such a showing, or the issue of tribal status is not resolved within the 18–month period, this Court will lift the stay and litigation will proceed. *See, e.g., id.* If and when the stay is lifted, the preliminary injunction granted herein will maintain the *status quo* until this case is decided on the merits.

### CONCLUSION

The set of facts before this Court is a prime example of the very situation preliminary injunctions were designed to address. For the foregoing reasons, Plaintiffs' motion for a preliminary injunction must be, and the same hereby is, GRANTED.

At this juncture, there are many undetermined factual issues surrounding the tribal status of the Shinnecock Nation. This uncertainty bears upon any ruling by this Court as to the sovereign immunity defense proffered by Defendants. This Court shall defer initially to the expertise of the BIA in determining the tribal status of the Shinnecock Nation.

Accordingly, this action is stayed for a period of 18 months, to be measured from the date the BIA deems complete the Shinnecock Nation's petition for federal recognition. Defendants are hereby ordered to cease and desist any and all development on the Property during the pendency of the stay and until the case is decided on the merits. Any action taken in furtherance of the development of the

Westwoods property will be deemed a violation of this Order.

SO ORDERED.