# MONTOYA *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 43. Argued December 14, 17, 1900. — Decided February 11, 1901.

The object of the Indian Depredation Act is to enable citizens whose property has been taken or destroyed by Indians belonging to any band, tribe or nation, in amity with the United States, to recover a judgment for their value both against the United States and the tribe to which the Indians belong, and which by the act is made responsible for the acts of marauders whom it has failed to hold in check. If the depredations have been committed by the tribe or band itself, acting in hostility to the United States, it is an act of war for which there can be no recovery under the act.

Where a company of Apache Indians, who were dissatisfied with their surroundings, left their reservation under the leadership of Victoria, to the number of two or three hundred, became hostile, and roamed about in Old and New Mexico for about two years, committing depredations and killing citizens, it was *held* that they constituted a " band " within the meaning of the act ; that they were not in amity with the United States, and that neither the Government nor the tribe to which they originally belonged, were responsible for their depredations.

THIS was a petition by the surviving partner of the firm of E. Montoya & Sons against the United States and the Mescalero Apache Indians for the value of certain live stock taken in March, 1880, by certain of these Indians, known as Victoria's Band.

The Court of Claims made the finding of facts set forth in the margin.[1]

---

[1] *Finding of Facts.*

1. At the time of the depredation hereinafter found Estanislao Montoya, Desiderio Montoya, and Eutimio Montoya were partners, doing business in Socorro County, New Mexico, under the name and style of E. Montoya & Sons, and were at the time, and long prior thereto, citizens of the United States, residing at San Antonio, in said county and Territory.

Thereafter, and long prior to the passage of the act of March 3, 1891, 26 Stat. L. 851, the said Estanislao and Desiderio Montoya died, leaving the claimant herein surviving.

2. On the 12th of March, 1880, the said firm of E. Montoya & Sons were

Upon these findings of fact the court decided as a conclusion of law that the petition be dismissed.  32 C. Cl. 349.  Claimant appealed.

---

the owners of the horses, mules and other live stock described in the petition, then being herded and cared for by their agents at a place called Nogal, about 8 miles west of San Antonio, which were stolen by Indians in the manner set f rth in finding 3.  Said stock was at the time and place reasonably worth more than three thousand dollars ($3,000).

3.  Prior to 1876 the Chiricahua Apache Indians were living on what was known as the Chiricahua reservation, in southeastern Arizona, and numbered from 300 to 500 warriors.  They had been a terror to the community and surroundings, and had met with success in their engagements with the troops of the United States Army.  Report Commissioner Indian Affairs, 1876, p. 10.

In 1876 an effort was made by the authorities having charge of Indian affairs to remove said Indians and locate them on the San Carlos reservation, where they could be more certainly restrained from hostile acts, but they resisted, and the result was that only 322 Indians, of whom 42 were men under Chief Taza, were removed thither.  Of those remaining 140 went to the Warm Springs agency in New Mexico, and about 400, including Victoria, became hostile, and roamed about in Old and New Mexico, committing depredations and killing citizens.  Report Secretary Interior, 1875, p. 711, and ib., 1876, p. 4.

Later these Indians were aided in their acts of hostility by Apache Indians from the Warm Springs agency, (Report Secretary Interior, 1877, p. 416,) and from this time until December, 1878, they continued their hostile acts.

In February, 1879, Victoria, a Chiricahua, who had previously rebelled against being placed on the San Carlos reservation, came near the military post of Ojo Caliente with 22 followers and agreed to surrender on condition that Nama's band, then at Mescalero, be allowed to join him, but only a few of that band surrendered, and in April following, Victoria, with his followers, escaped and went to the San Mateo Mountains.  Report Secretary Interior, 1879, p. 100.

The military forces pursued him into Arizona, where he recruited his forces from the members of his tribe then being held as prisoners of war at the San Carlos reservation, and he subsequently escaped into Old Mexico.  Record of Engagements with Hostile Indians, by General Sheridan, p. 84.

On the 30th of June following, Victoria, with 13 men, came into the Mescalero reservation, where there were at the time a few Gila, Membres and Mogollen Apaches, known as Southern Apaches, and at his request the families of those Indians (Chiricahuas) who had been kept on the San Carlos reservation were sent for.

Victoria was soon thereafter indicted in New Mexico for murder and horse stealing, and he became fearful of arrest and conviction therefor and

*Mr. William B. King* and *Mr. William H. Robeson* for appellant.

*Mr. Assistant Attorney General Thompson* and *Mr. Kie. Oldham* for appellees.    *Mr. Lincoln B. Smith* was on the Assistant Attorney General's brief.

MR. JUSTICE BROWN delivered the opinion of the court.

The first section of the act of March 3, 1891, c. 538, 26 Stat. 851, vests the Court of Claims with jurisdiction to inquire into

suddenly left the reservation (in July), taking with him those he had brought and also all the Southern Apaches on that reservation.    Report Secretary Interior, 1890, p. 100.

They went west and began marauding, destroying property, and killing citizens, and so continued during the latter part of winter and early spring of 1880 within 40 miles of the Mescalero reservation, Victoria in the mean time using his influence to induce the Mescaleros to join his forces, and by April, 1880, some 200 to 250, of whom 50 or 60 were men, left their reservation and joined him.    Report Secretary of Interior, 1880, p. 251.    They continued their warfare until driven by the troops under Colonel Hatch, United States Army, across the Rio Grande River into the San Andrès Mountains in April, 1880, where he had a severe fight with them and several of his men were wounded and a number of Indians, including a son of Victoria, were killed.    They finally retreated into Mexico.

Under the leadership of Victoria they again crossed and recrossed the line to and from the United States, but were driven out twice by the forces under Colonel Grierson, United States Army, and their forces diminished, until finally the few remaining were driven by General Buell some time after October 1, 1880, into Mexico, where Victoria and nearly all of his followers were killed.    Report Secretary of War, 1880, pp. 86 and 118.

During all the period of hostilities as aforesaid Victoria had under him a *minority* of the Chiricahua tribe of Apache Indians.    At his solicitation he was reënforced from time to time during said period by a *minority* of the Indians from the Mescalero and Southern Apache tribes; besides had under him a number of unknown Indians from Mexico, making in all about 200 Indians in his band at the time of the depredation hereinafter found.

These Indians were allied together under the name of Victoria's band for the purpose of aiding Victoria and his followers in their hostile and warlike acts against the citizens and the military authorities of the United States.

The alliance thus formed, as well as the hostile acts committed by the band, were without the consent of the several tribes from which the members of the band came and to which they had previously belonged.

and finally adjudicate " First. All claims for property of citizens of the United States taken or destroyed by Indians belonging to any band, tribe or nation in amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for."

To sustain a claim under this section, it is incumbent upon the claimant to prove that the Indians taking or destroying the property belonged to a band, tribe or nation in amity with the United States. The object of the act is evidently to compensate settlers for depredations committed by individual marauders belonging to a body which is then at peace with the Gov-

---

From the reports referred to in the foregoing findings, and also in the various reports of military officers and the Secretary of War, embodied in the report of the latter officer for 1879 and 1880, it appears·that the Indians under Victoria, from whatever tribes, were recognized or referred to under the name of Victoria's band, and under that name were operated against for two years or more by the military authorities for their acts of war and hostility against the United States, until driven out of the country and destroyed as aforesaid.

On the 12th of March, 1880, the property set forth in finding 2 was stolen and driven away or destroyed by the Mescalero Apache Indians, who were at the time allied with Victoria's band for the purpose of hostility and war as aforesaid, and that said band so constituted was not at the time of said depredation in amity with the United States.

But the Mescalero tribe, then on their reservation near Fort Stanton, about 100 miles distant from the scene of the depredation, and to which the Mescaleros who committed the depredation had belonged before they joined Victoria's band, was in amity with the United States.

Said property was taken without any just cause or provocation on the part of the owners or their agents in charge, and has never been returned or paid for in whole or in part.

4. Upon the foregoing findings of fact the court finds the ultimate fact, so far as it is a question of fact, that the depredation set forth in finding 3 was committed by Indians belonging to a war party or hostile band, known as Victoria's band, of Apache Indians, which was at and long before that time known and recognized as a band, separate and distinct in its organization and action· from the several tribes, then at peace, to which its members had formerly belonged, and that the band as thus constituted was not in amity with the United States at the date of said depredation.

5. The claim which is the subject of this suit was presented to the defendant Indians in council on or before June 8, 1880, by S. A. Russell, agent for the Mescalero Apache Indians, under the direction of the Commissioner of Indian Affairs.

ernment. If the depredation be committed by an organized company of men constituting a *band* in itself, acting independently of any other band or tribe, and carrying on hostilities against the United States, such acts may amount to a war for the consequences of which the Government is not responsible under this act, or upon general principles of law. *United States v. Pacific Railroad,* 120 U. S. 227, 234.

The North American Indians do not and never have constituted "nations" as that word is used by writers upon international law, although in a great number of treaties they are designated as "nations" as well as tribes. Indeed, in negotiating with the Indians the terms "nation," "tribe" and "band" are used almost interchangeably. The word "nation" as ordinarily used presupposes or implies an independence of any other sovereign power more or less absolute, an organized government, recognized officials, a system of laws, definite boundaries and the power to enter into negotiations with other nations. These characteristics the Indians have possessed only in a limited degree, and when used in connection with the Indians, especially in their original state, we must apply to the word "nation" a definition which indicates little more than a large tribe or a group of affiliated tribes possessing a common government, language or racial origin, and acting for the time being, in concert. Owing to the natural infirmities of the Indian character, their fiery tempers, impatience of restraint, their mutual jealousies and animosities, their nomadic habits, and lack of mental training, they have as a rule shown a total want of that cohesive force necessary to the making up of a nation in the ordinary sense of the word. As they had no established laws, no recognized method of choosing their sovereigns by inheritance or election, no officers with defined powers, their governments in their original state were nothing more than a temporary submission to an intellectual or physical superior, who in some cases ruled with absolute authority, and in others, was recognized only so long as he was able to dominate the tribe by the qualities which originally enabled him to secure their leadership. In short, the word "nation" as applied to the uncivilized Indians is so much of a misnomer as to be little more than a compliment.

We are more concerned in this case with the meaning of the words "tribe" and "band." By a "tribe" we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory; by a "band," a company of Indians not necessarily, though often of the same race or tribe, but united under the same leadership in a common design. While a "band" does not imply the separate racial origin characteristic of a tribe, of which it is usually an offshoot, it does imply a leadership and a concert of action. How large the company must be to constitute a "band" within the meaning of the act it is unnecessary to decide. It may be doubtful whether it requires more than independence of action, continuity of existence, a common leadership and concert of action.

Whether a collection of marauders shall be treated as a "band" whose depredations are not covered by the act may depend not so much upon the numbers of those engaged in the raid as upon the fact whether their depredations are part of a hostile demonstration against the Government or settlers in general, or are for the purpose of individual plunder. If their hostile acts are directed against the Government or against all settlers with whom they come in contact, it is evidence of an act of war. Somewhat the same distinction is applicable here which is noticed by Hawkins in his Pleas of the Crown, and other ancient writers upon criminal law, as distinguishing a riot from a treasonable act of war. Thus it is said in Wharton on Criminal Law, section 1796, summing up the early authorities, (though never accepted as a definition of treason in this country): "That constructive levying of war, by the old English common law, is where war is levied for the purpose of producing changes of a public and general nature by an armed force; as where the object is by force to obtain the repeal of a statute, to obtain the redress of any public grievance, real or pretended; to throw down all enclosures, pull down all bawdy houses, open all prisons, or attempt any general work of destruction; to expel all strangers, or to enhance the price of wages generally;" but if these acts were directed against a particular individual they would amount to nothing more than an assault or riot.

While as between the United States and other civilized nations, an act of Congress is necessary to a formal declaration of war, no such act is necessary to constitute a state of war with an Indian tribe. In his concurring opinion in *Bas* v. *Tingy,* 4 Dall. 37, recognizing France as a public enemy, Mr. Justice Washington recognized war as of two kinds: " If it be declared in form, it is called solemn, and is of the perfect kind ; because one whole nation is at war with another whole nation, and all the members of the nation declaring war, are authorized to commit hostilities against all the members of the other, in every place and under every circumstance. In such a war all the members act under the general authority, and all the rights and consequences of war attach to their condition. But hostilities may subsist between two nations, more confined in its nature and extent, being limited as to places, persons and things ; and this is more properly termed imperfect war, because not solemn, and because those who are authorized to commit hostilities, act under special authority, and can go no farther than to the extent of their commission. Still, however, it is public war, because it is an external contention by force between some of the members of the two nations, authorized by the legitimate powers." Indian wars are of the latter class. We recall no instance where Congress has made a formal declaration of war against an Indian nation or tribe ; but the fact that Indians are engaged in acts of general hostility to settlers, especially if the Government has deemed it necessary to dispatch a military force for their subjugation, is sufficient to constitute a state of war. *Marks* v. *United States,* 161 U. S. 297.

In determining the liability of the United States for the acts of Indian marauders, the fifth and sixth sections of the Indian Depredation Act should be considered as well as the first. By the fifth section " the court shall determine in each case the value of the property taken or destroyed at the time and place of the loss or destruction, and, if possible, the tribe of Indians or other persons by whom the wrong was committed, and shall render judgment in favor of the claimant or claimants against the United States, and against the tribe of Indians committing the wrong, when such can be identified." Of course, if the

tribe to whom the Indians belong cannot be ascertained, this will not prevent a judgment against the United States, but if their connection with a particular tribe can be established, judgment shall also go against the tribe. By section six " the amount of any judgment so rendered against any tribe of Indians shall be charged against the tribe by which, or by members of which, the court shall find the depredation was committed, and shall be deducted and paid " from annuities or other funds due the tribe from the United States, or from any appropriation for the benefit of the tribe.

It is not altogether easy to reconcile the language of these sections, which seem to contemplate that the government may be liable for depredations committed by a *tribe,* with that of section one under which the jurisdiction of the Court of Claims is limited to the acts of " Indians *belonging* to any band, tribe or nation, in amity with the United States ; " but the main objects of sections five and six would seem to be to impose upon the tribes the duty of holding their members in check or under control, and for a failure so to do to fix upon the tribe the responsibility for the acts of individual members acting in defiance of the authority of their tribe or band, upon the same principle that, by sundry statutes in England and in several of the United States, the hundred or the municipality is made responsible in damages for the acts of rioters. Like the English statutes, too, many of the Indian treaties provide that if the property be restored or the guilty members be delivered up for punishment, no pecuniary indemnity shall be required. On the other hand, if the marauders are so numerous and well organized as to be able to defy the efforts of the tribe to detain them, in other words, to make them a separate and independent band, carrying on hostilities against the United States, it would be obviously unjust to hold the tribe responsible for their acts. · It can hardly be supposed that Congress would impose a liability upon tribes in amity with the United States, for the acts of an independent band, strong enough to defy the authority of the tribe, although it would not be inequitable to hold the tribe liable for individual members whom it was able, but had failed, to control.

Gauged by these considerations it is clear that the Court of

Claims was justified in its ultimate finding that Victoria's band was at and long before the occurrence complained of "known and recognized as a band, separate and distinct in its organization and action from the several tribes, then at peace, to which its members had formerly belonged, and that the band as thus constituted was not in amity with the United States." Conceding that the accuracy of this ultimate finding may be reviewed by this court by a reference to the special facts found as a basis for such finding, *United States* v. *Pugh,* 99 U. S. 265, in our opinion those facts amply support the finding.

It appears that prior to 1876 the Chiricahua Apache Indians, who numbered from three to five hundred warriors of a particularly savage type, were living on a reservation of their own in Arizona; and that during that year the department determined to remove these Indians and locate them upon another reservation, where they could be more easily restrained from hostile acts. A part of them resisted, and about four hundred, under the leadership of Victoria, began roaming about Old and New Mexico, committing depredations and killing citizens. These hostile demonstrations continued until December, 1878, soon after which Victoria made an offer of surrender on a condition that was not performed, and in the following spring he again took the field, pursued by the military forces into Arizona, and subsequently escaped into Mexico. Soon thereafter he was indicted in New Mexico for murder and horse stealing, when he went west and began marauding, destroying property and killing citizens, and so continued during the latter part of the winter and early spring of 1880. The operations against them continued until they were driven by the troops across the Rio Grande River, where a severe engagement ensued and a number of Indians, including a son of Victoria, were killed. The band appears to have been of sufficient strength and consequence to have been made the object of a military expedition, which operated upon both sides of the Mexican line, and finally resulted in a battle in Mexico in the autumn of 1880, where Victoria and most of his followers were killed. The Indians constituting this band seem to have belonged to different tribes of Apaches, and were about two

hundred in number at the time this depredation was committed. They were evidently carrying on hostile acts against the settlers and military authorities of the United States, and the court expressly finds that such acts were "without the consent of the several tribes from which the members of the band came and to which they had previously belonged;" that they were denominated in various reports of military officers to the Secretary of War as "Victoria's band," and under that name were pursued for two years or more by the military authorities for their acts of war and hostility against the United States, until driven out of the country and destroyed. The property in question was stolen and driven away, or destroyed, by certain Mescalero Apache Indians, who were at that time allied with Victoria's band for the purpose of hostility and war as aforesaid, and the band so constituted was not in amity with the United States, although the Mescalero tribe, which was then upon its reservation about one hundred miles distant from the scene of the depredation, and to which the Mescaleros who committed the depredation had belonged before they joined Victoria's band, was in amity with the United States.

As it appears that the Mescaleros who committed the depredation were a part of Victoria's band, operating with them, and that such band was carrying on a war against the Government as an independent organization, we think they were the band—the unit, contemplated by the act, and not the Mescalero tribe then living in peace upon their reservation near Fort Stanton, although the particular marauders in question had belonged to that tribe before they joined Victoria's band. If the Mescalero tribe were held responsible for their acts it would follow that every tribe, members of which allied themselves with Victoria and shared in his acts of hostility, would be pecuniarily liable for all damages inflicted by a band over whom they could have no control. Such consequences would be so inequitable we cannot suppose them to have been contemplated by Congress.

The judgment of the Court of Claims is

*Affirmed.*