State of NEW YORK, New York State Racing and Wagering Board, New York State Department of Environmental Conservation and Town of Southampton, Plaintiffs;

v.

THE SHINNECOCK INDIAN NATION, Randall King, James W. Eleazer, Jr., Lance A. Gumbs and Frederick C. Bess, Defendants.

Town of Southampton, Plaintiffs.

v.

The Shinnecock Tribe, A/K/A/ the Shinnecock Indian Nation, Randall King, James W. Eleazer, Jr. and Lance A. Gumbs, Defendants.

Nos. 03–CV–3243(TCP),
03–CV–3466(TCP).

United States District Court,
E.D. New York.

Nov. 7, 2005.

George Hammarth, Assistant Attorney General, Hauppauge, NY, for State of New York, New York State Racing and Wagering Board, New York State Department of Environmental Conservation.

Christopher H. Lunding, Cleary, Gottlieb, Steen & Hamilton LLP, New York, NY, for Shinnecock Indian Nation, James

W. Eleazar, Jr., Lance A. Gumbs, Fred Bess, defendant.

## MEMORANDUM and ORDER

PLATT, District Judge.

Defendants ("the Shinnecock Indian Nation" or "Shinnecock Indians" or "Shinnecock Tribe") have moved for Summary Judgment and the State of New York ("State") and the Town of Southampton ("Town") have moved for partial summary judgment in this consolidated action in which the State and its subdivision the Town seek to enjoin the Defendants from developing that part of their real property known as "Westwoods" (or "the Property") with a casino open to the public.

This Court has heretofore written on plaintiffs' Motion for a Preliminary Injunction in a published Memorandum and Order dated August 29, 2003, *New York v. Shinnecock Indian Nation*, 280 F.Supp.2d 1 (E.D.N.Y.2003) [hereinafter Shinnecock Order], familiarity with which is presumed.

### BACKGROUND

The Shinnecock Nation is, and has been, recognized as an Indian tribe by the State of New York for more than 200 years. (Provenzano Aff. Supp. Def. Mot. Summ. J. ("Defs.' Aff.") Ex. A, K, and L.) The Shinnecock Nation has offices, and is otherwise located, at the Shinnecock Indian Reservation, within the Town of Southampton, County of Suffolk. (Town Compl. ¶ 2). The individual defendants are three tribal officials of the Shinnecock Nation sued in their official capacities. (*Id.* ¶ 4–6.)

The Shinnecock Nation is the owner of certain real property, Westwoods, located in the Town of Southampton in the community of Hampton Bays. (*Id.* ¶ 7.) Westwoods, a seventy nine (79) acre site, con-

sists of two (2) contiguous lots running north-south, bisected by Newtown Road, bounded to the north by the Great Peconic Bay and to the south by Sunrise Highway. (*Id.*) The Property is not located within the boundaries of the Shinnecock Indian Reservation as recognized by the State. (*Id.* ¶ 10.) However, Defendants claim they retain "aboriginal" or "Indian" title to Westwoods because the Property allegedly consists of tribal land historically controlled by the Shinnecock Nation. (Defs.' Mem. Opp. Town Mot. Part. Summ. J. at 3.)

The Shinnecock Nation has proposed building a gambling facility at Westwoods. (Town Compl. ¶ 11.) Defendants planned to commence construction of this casino on June 30, 2003 by "clearing brush, removing trees and grading the portions of the Westwoods Parcel where the [casino] is contemplated to be constructed." (Defs.' Answer to State Compl. ¶ 52.) On June 30, the Shinnecock Nation allegedly held a groundbreaking ceremony at Westwoods, and thereafter, on July 12, 2003, Defendants began using a bulldozer to clear trees and grade land located on the Property. (Town Compl. ¶¶ 13, 15.) Plaintiffs allege approximately five (5) acres of land were cleared in preparation for construction of a gambling facility.

Plaintiffs claim the contemplated facility will include "as many as 1,000 slot machines, more than 100 gaming tables, a food court, an entertainment stage, and a high-stakes bingo hall."[1] (State Compl. ¶ 50.) The proposed casino will allegedly consist of a 65,000 square-foot gaming facility and will attract millions of visitors every year. (*Id.* ¶ 45.)

According to an affidavit from the Deputy Regional Director in the Eastern Region of the Bureau of Indian Affairs, the Shinnecock Nation is not a "federally" recognized Indian Tribe. (Pogue Aff. ¶ 2.) Furthermore, the Director averred that Westwoods is not considered Indian land because it is neither a federal Indian reservation nor is it land held in trust by the United States for an Indian Tribe. (*Id.* ¶ 3.) Although the Shinnecock Nation petitioned for federal recognition in 1978, that recognition has not yet been granted by the federal government. (*Id.* ¶ 2; Cohen Decl. Supp. Town Mot. Part. Summ. J. ("Town's Aff.") Ex. I.)

The problem is complicated by reason of the Plaintiffs' claims which allege (i) that the defendants may not construct and operate a casino on their property without first obtaining from the State a permit to operate a casino on their premises satisfying that they have resolved all environmental, traffic, transportation, water, power and other local problems (State's Mem. Supp. Part. Summ. J. at 19–20), and (ii) that Defendants are not a recognized Tribe and thus are not entitled to apply for a permit from the State (*see* State's Opp. Mem. Defs.' Mot. Summ. J.) ("State's Opp. Mem.") at 14. Moreover, the United States was impleaded in the case by the Court and opted out of the case with the consent of all the parties and was thereafter dismissed.

■ With respect to the second part of the problem, the State and Town commenced their opposition by claiming that the Defendants were not an Indian Tribe in fact because they had not been recognized as such by the Bureau of Indian Affairs. (*Id.*)

The arguments advanced by the State Attorney General and, also, by the Town

---

1. Defendants admit only that the proposed casino will have the capacity to hold between 900 and 1,000 gaming machines and 60 table games. (Defs.' Answer to State Compl. ¶ 50).

Attorney, were and are, at best, blatantly inconsistent (to say the least).

The issue of whether the Shinnecock Indians were and are an Indian Tribe was decided in New York by the enactment of a law by the New York State legislature and signed by the Governor in 1792, and that law remains in effect today. (*See* Defs.' Aff. Ex. I) (for a discussion of the history of this law, see the Defendants' Memorandum of Law in support of their Motion for Summary Judgment, pages 8–9, which is reproduced as an Appendix attached to this Memorandum and Order).

A great deal of evidence corroborates this Court's conclusion that the Shinnecock Indians are in fact an Indian Tribe. Defendants submitted a Fact Statement containing facts which are, for the most part, undisputed and which show that the Shinnecock Indian Nation:

- Was in possession of the lands in and around the Town of Southampton when the first European settlers arrived in 1640 (*See* Defs.' Aff. Ex. F at ii-iii, MM);
- Existed as an Indian Tribe in 1665 when Richard Nicolls, then Governor of the Province of New York, purported to settle a boundary dispute between the Shinnecock and Unquachog Indians (Defs.' Aff. Ex. B at 1, transcribed and attached in Ex. C);
- Existed as an Indian tribe in 1667 when the tribe and its lands in and around the Town of Southampton were described in a lawsuit between the inhabitants of Southampton and Southold (Defs.' Aff. Ex. E);
- Existed as an Indian tribe in 1703 when it purportedly executed a 1,000 year lease with the Town for a large tract of land within the Town (Defs.' Aff. Ex. G at X);
- Existed as an Indian tribe in 1792, 1816, 1841, 1877, 1892 and 1909 when the Legislature of the State of New York enacted legislation purportedly affecting the Shinnecock tribe of Indians (Defs.' Aff. Ex. I, J, V, FF, HH, and II);
- Existed as an Indian tribe in 1859 when the legislature of the State of New York enacted legislation purporting to authorize "the Shinnecock tribe of Indians to exchange certain rights in land with the trustees of the proprietors of the common and undivided lands and marshes in the Town of Southampton" (Defs.' Aff. Ex. W);
- Existed as an Indian tribe in 1865 when the Superintendent of the Census wrote in his report of the 1865 Census of the State of New York that a tract of land in Southampton had been occupied by the Shinnecock Tribe of Indians "from time immemorial" (Defs.' Aff. Ex. BB);
- Existed as an Indian tribe in 1922 when the Supreme Court, Suffolk County, found the Shinnecock tribe to be "a tribe of Indians recognized as such by the Government of the State of New York that had for many years resided on Shinnecock Neck in the Town of Southampton" (Defs.' Aff. Ex. JJ);
- Existed as an Indian tribe in 1941 when listed in a document titled "Tribes by State and Agency" created by the Office of Indian Affairs of the United States Department of the Interior (Defs.' Aff. Ex. LL);
- Existed as an Indian tribe in 1974 when the legislature of the State of New York described the Shinnecock tribe of Indians as "among the first to seek an honorable peace with their European brothers" who have "executed peace treaties with the King of England prior to the formation of a colonial government" and urged Congress to acknowledge the Shinnecock Tribe by legislation

(Defs.' Aff. Ex. OO, transcribed and attached as QQ);

● Existed as an Indian tribe in 1987 when Robert C. Batson stated, in a letter written in the course of his duties as an Associate Counsel for the New York State Department of State, that the Shinnecock tribe of Indians is "one of the historic tribes of Long Island which still has tribal existence and occupies land generally within its aboriginal territory", and "[a]s an Indian tribe, the Shinnecocks have sovereign authority to govern their territory" (Defs.' Aff. Ex. UU);

● Has functioned under a political leadership for more than 200 years, having met as a tribe to elect tribal leaders in every year from 1792 through 2004. (Defs.' Aff. Ex. I, K at 6, CCC, DDD.)

(Defs.' Reply Mem. Supp. Summ. J. ("Defs.' Reply Mem.") at 4–5.)

In addition, the following are admissions of Officers of the State and the Town:

● Defs.' Aff. Ex. A at 1 (1996 statement by Attorney General Vacco that the Shinnecock Tribe's relationship with the State predated the existence of the federal government);

● Defs.' Aff. Ex. NN at 3 (1955 statement by Attorney General Javits that the Shinnecock tribe cannot sue or be sued, or give good title);

● Defs.' Aff. Ex. TT (1985 statement by New York Secretary of State Shaffer that the Shinnecock Tribe was treated as an Indian tribe by colonial authorities and by the State);

● Defs.' Aff. Ex. VV (1987 statement by Town Attorney Fred Thiele that the Tribe's reservation is accorded the same exemption as government-owned land used in a government capacity);

● Defs.' Aff. Ex. MM (statement by Town historian Robert Keene that the Shinnecock Tribe occupies the same territory where it was found by European settlers in 1640).

(Defs.' Reply Mem. at 6.)

Moreover, the State and Town themselves:

● admit that a large majority of members of the Shinnecock Indian Nation descend from the historic Shinnecock tribe of Indians, through their submission of "expert" reports of J. Kay Davis (respectively the 1st, 2nd and 3rd Report). In her 2nd Report, Ms. Davis concludes that more than 89% of the current tribal members trace back to persons identified as Indian in the 1900 and 1910 Federal Indian census. *See* Siegfried Declaration, dated Feb. 17, 2005, Ex. N (Shinnecock Nation Report) at 16.

And the records shows:

● that the Shinnecock Indian Nation is united in a community under one leadership or government. The State and Town have admitted that the Shinnecock Indian Nation has met to elect tribal trustees every year for the past 212 years. (Defs.' Reply Mem. at 7; Defs.' Aff. Ex. I, K at 6, L, CCC, DDD.)

Plaintiffs repeatedly argue that "defendants' [sic] estoppel theory of tribal status fails" (Town's Opp. Mem. Defs.' Mot. Summ. J. at 7; State's Opp. Mem. at 19–23) because the State's recognition of a tribe of Indians is not dispositive of the tribal status of a group. Plaintiffs cite *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir.1994) to justify this argument. The fallacy in this position is that while the Court, on its own motion, impleaded the Government in this case and the Government appeared by the United States Attorney for this District and remained in this case long enough (from December 22, 2003 to May 26, 2004) to become fully conversant with the prob-

lems, the Government chose, with the concurrence of the Plaintiffs and Defendants, to opt out of the case. From this, one may conclude that the United States is disclaiming any interest in the question and accepts the status of the Defendants as an Indian Tribe. So, also, did the Plaintiffs waive their right to maintain (i) that the United States was an indispensable or even an interested party in the determination of whether the Defendants are an Indian Tribe, or (ii) that the Defendants are not (as they maintain) an independent sovereign by reason of their continuous existence prior to the formation of the United States. Moreover, the United States, by opting out, did not disagree with the Defendants' position that the New York legislative enactment recognized the Shinnecock Indian's tribal status over 200 years ago.

In sum, without objection by the Plaintiffs and with full knowledge of these proceedings, then in progress, the United States elected to opt out of these proceedings. It would seem to this Court that, if the Attorney General of the United States had believed the law to be other than as thus stated, he had a duty not only to advise this Court but to defend that position. The Office of the Attorney General did not do so.

Under the circumstances, the Court sees no requirement or need for further inquiry into this matter and certainly no need for an "evidentiary hearing" on this issue as demanded by the Plaintiffs.

That leaves this Court with a firm conviction that the Defendants are correct in their position that they were an Indian Tribe not only when the first white settlers arrived in the eastern end of Long Island in 1640, but were such in 1792 when New York State enacted a law confirming that fact and that they remain an Indian Tribe today. (*See supra* pp. 6–9 (describing numerous instances in which New York State recognized the Shinnecocks as an Indian Tribe.))

Moreover, in the Court's opinion, given all of the above, the Defendants, in this case, fall squarely within the umbrella of the *Montoya v. United States,* 180 U.S. 261, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901) and *Golden Hill,* 39 F.3d 51 line of cases and are not obligated under present circumstances to seek or obtain approval by the United States before proceeding to develop their properties. In *Montoya* and *Golden Hill,* the Supreme Court and Second Circuit, respectively, considered whether to recognize certain Indians as Tribes without waiting for recognition by the United States. *See Montoya,* 180 U.S. at 262, 21 S.Ct. 358, 45 L.Ed. 521; *Golden Hill,* 39 F.3d at 59.

As Defendants correctly point out in their Brief:

When the status of an Indian tribe is at issue, the courts of the United States look exclusively to federal law to determine the tribe's status. *See, e.g., Montoya v. United States,* 180 U.S. 261, 266, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901); *United States v. Candelaria,* 271 U.S. 432, 442, 46 S.Ct. 561, 70 L.Ed. 1023 (1926); *Cherokee Nation of Okla. v. Babbitt,* 117 F.3d 1489, 1499–1503 (D.C.Cir.1997) (holding that "the court must itself decide whether the [tribe] constitute[s] a sovereign tribe" for immunity purposes); *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 59; *Mashpee Tribe v. Sec'y of Interior,* 820 F.2d 480, 482–84 (1st Cir.1987); *Catawba Indian Tribe of S.C. v. State of South Carolina,* 718 F.2d 1291, 1298 (4th Cir.1983), *aff'd,* 740 F.2d 305 (4th Cir. 1984) (*en banc* ), *rev'd on other grounds,* 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986); *Bottomly,* 599 F.2d at 1064–67; *Mashpee Tribe v. New Seabury*

*Corp.*, 592 F.2d 575, 581 (1st Cir.1979); *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 n. 8 (1st Cir.1975); *Tully v. United States*, 32 Ct.Cl. 1 (1896); *Koke v. Little Shell Tribe of Chippewa Indians of Montana, Inc.*, 315 Mont. 510, 68 P.3d 814, 816–17. As the *Golden Hill* court observed, in the context of a Nonintercourse Act claim:

> "Federal courts have held that to prove tribal status under the Nonintercourse Act, an Indian group must show that it is 'a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory.' The formulation of this standard and its use by the federal courts occurred after Congress delegated to the executive branch the power to prescribe regulations for carrying into effect statutes relating to Indian affairs and without regard to whether or not the particular group of Indians at issue had been recognized by the Department of the Interior."

Defs.' Mem. Summ. J. at 18–19 (quoting *Golden Hill*, 39 F.3d at 59) (internal citations omitted).

The cases described above, beginning with *Montoya* and continuing to the present, establish a federal common law standard for determining tribal existence that the Shinnecock Indian Nation plainly satisfies.

As noted above, the Supreme Court defined an Indian Tribe as "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *Montoya v. U.S.*, 180 U.S. 261, 266, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901).[2]

We pointed out in our Memorandum and Order dated August 29, 2003:

> The Second Circuit in *Golden Hill* discussed the interplay between the *Montoya* definition and the BIA criteria for recognizing Indian tribes.
>
> > "The two standards overlap, though their application might not always yield identical results. A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. Where a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant compo-

---

**2.** Although this Court has already recognized the tribal status of the Shinnecocks based on the Plaintiffs' past admissions, it is also worth noting that the Shinnecocks clearly meet the criteria for tribal status set forth in *Montoya v. United States*, 180 U.S. 261, 266, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901). First, the Shinnecocks share a similar race. As noted above, the State has conceded that "89% of current tribal members trace back their ancestry back to persons identified as Indian in the 1900 and 1910 Federal Indian censuses." *See* Siegfried Declaration, dated Feb. 17, 2005, Ex. N, Shinnecock Nation Report, at 16.

It is also apparent that the Shinnecocks are united under one leadership as required by the second prong in *Montoya*. The Shinnecock Indians have met as a tribe to elect tribal leaders every year from 1792 to 2004, pursuant to a New York State law enacted in 1792. (Defs.' Reply Mem. at 5; Defs.' Aff. Ex. L.)

Lastly, the Shinnecocks have inhabited a particular and defined territory, namely the Town of Southampton, since before the arrival of the Europeans. (Defs.' Reply Mem. at 8; Defs.' Aff. Ex. A, B, C, D, and E.) The Shinnecocks own a reservation in the Town and have inhabited other areas such as Westwoods for centuries. (*See* Defs.' Aff. Ex. A.) Thus, the Shinnecock Indians have satisfied the *Montoya* criteria.

nent of a dispute properly before the court, it is desirable that the agency and the court go down the same track—although at different times—to attain the statute's ends by their coordinated action."

*Shinnecock Order,* 280 F.Supp.2d at 8 (quoting *Golden Hill,* 39 F.3d at 59).

Most significantly, the Second Circuit went on to state:

"*A federal court, of course, retains final authority to rule on a federal statute,* but should avail itself of the [federal] agency's aid in gathering facts and marshaling them into a meaningful pattern."

*Id.* (quoting *Golden Hill,* 39 F.3d at 59 (emphasis added)).

The Second Circuit remanded this and all similar questions to this Court for determination (because of the BIA's inability to reach these decisions for some twenty years from that date). *See New York v. Shinnecock Indian Nation,* No. 03–7996 (2d Cir. Nov. 26, 2003).

Such are the facts and the law in New York on the subject, which the State Attorney General and Town Attorney were and are obligated to uphold and defend. It is not for them now to argue otherwise in this Court. Nor is it for them to proclaim that the law of the United States is to the contrary.

Unfortunately, recognizing the Shinnecocks as a Tribe does not end the matter. The question remains as to what use Defendants may put the Westwoods property adjacent to the western border of their reservation.

In dispute is the nature of the title held by the defendant Indian Tribe, i.e. whether it currently still holds its aboriginal title (as the Defendants claim) (*see* Defs.' Mem.

Summ. J. at 2; Defs.' Answer to Town Compl. ¶ 7), or whether it holds a reacquired title by adverse possession or some other right (as the Plaintiffs claim) (*see* Town's Mem. Part. Summ. J. at 19). It seems clear that the Supreme Court in *City of Sherrill v. Oneida Indian Nation,* 544 U.S. 197, ——, 125 S.Ct. 1478, 1490, 161 L.Ed.2d 386 (2005), rejected the "unification" theory. Under this theory, a Tribe which has aboriginal title to its reservation land has the power to extend its aboriginal title to newly acquired lands. The Supreme Court held, "[w]e now reject the unification theory of [the Oneidas] . . . and hold that 'standards of federal Indian law and federal equity practice' preclude the Tribe from rekindling embers of sovereignty that long ago grew cold." *See id.* (internal citations omitted). As such, the title to Westwoods, if acquired by adverse possession, must be considered in its present independent status.

■ The facts with respect to this status are found in an unpublished proceeding in the Supreme Court, Suffolk County, which took place in December of 1922. *See Shinnecock Tribe v. Hubbard,* (N.Y.Sup.Ct. Dec. 27, 1922).[3] In that case, Supreme Court Justice Edward C. Whitaker appointed the Honorable Robert S. Pelletreau, to "try the issues and determine the questions referred to him and make a just and true report." Mr. Pelletreau proceeded to make *inter alia* the following findings of fact:

I. That the plaintiff is a tribe of indians recognized as such by the Government of the State of New York. (Findings ¶ I.)

II. Cornelius H. Eleazer, Elliott A. Kellis and Seymour Eleazar are the

---

**3.** The Findings of Fact, Conclusions of Law, and Judgment in *Shinnecock Tribe v. Hubbard,* (N.Y.Sup.Ct. Dec. 27, 1922) are repro-

duced in the Appendix attached to this Memorandum and Order.

Trustees, chiefs and head men of said tribe. (*Id.* ¶ II.)

\*   \*   \*   \*   \*   \*

IV.  That plaintiff has for many years resided on Shinnecock Neck in the town of Southampton claiming under a lease and later under a deed from the Trustees of the Proprietors of the Common and undivided lands of the Town of Southampton; which land is arable and without timber. (*Id.* ¶ 4.)

V.  That said residence has continued to this time and during the same and for more than 70 years last past plaintiff and the members thereof have obtained its firewood and fencing from a tract of land North of Canoe Place, about 6 miles distant from said Neck,

———

Bounded North by Peconic Bay,

East by Xtopher Holzman,

South by land formerly of Mr. Buchmuller,

West by land of Mr. Hardy and Mr. Hearn,

About 100 acres. (*Id.* ¶ V.)

VI.  That the plaintiff has cut wood on all parts of said tract; that within the memory of living witnesses three, four or five families of said tribe resided on said tract, cultivated two or three small lots and had apple or other fruit trees and said acts were done under claim of right. (*Id.* ¶ VI.)

And *inter alia* the following conclusions of law:

I.  That this action is properly brought and is authorized by The Indian Law. (Conc. Law ¶ I).

II.  That the plaintiff has good title by adverse possession to the parcel of land described in the fifth finding of fact. (*Id.* ¶ II); *see supra.*

These findings and conclusions were confirmed in a Judgment in which it was decided:

1.  That this action is properly brought and is authorized by The Indian Law. (Judgment ¶ 1.)

2.  That the plaintiff has good title by adverse possession to the parcel of land described in the fifth finding of fact. (*Id.* ¶ 2.)

In addition, it appears to be undisputed that neither the Town nor the State has imposed any taxes on the real property contained in the Indian's reservation or the Westwoods property occupied by members of the Indian Tribe since circa 1850. (*See* Provenzano Supplemental Aff. Supp. Defs.' Mot. Summ. J. Ex. B ¶¶ 220–23, C) Today, that may constitute acceptance by the Town of the Shinnecock Tribe's claim for adverse possession or even of their claim for aboriginal title.[4]  *See Albany Parking Services, Inc. v. City of Albany*, 3 A.D.3d 711, 770 N.Y.S.2d 472 (N.Y.App. Div.2004).

---

4.  It has been suggested that an owner by adverse possession against a municipality in New York may be subject to a defense of immunity by the latter.  In *Albany Parking Services, Inc. v. City of Albany*, 3 A.D.3d 711, 711, 770 N.Y.S.2d 472 (N.Y.App.Div.2004), the court held that "[t]itle to the disputed area turns upon whether the City owned it in a government capacity, which would make it immune to adverse possession, or in a proprietary capacity, which would not protect it" (citations omitted).

Here, as there, the Municipality "[n]either formally dedicated the property to any other public use" [n]or actually used it for a public purpose."  *Id.* at 712, 770 N.Y.S.2d 472. Consequently, the property was subject to the Tribes' "adverse possession."

It may, also, be argued that the Town was not the "named" defendant in the Suffolk County proceeding which only named its road foreman who took some loam from the property for the Town and did not pay for it. *Shinnecock Tribe*, Opinion at 1.

In its Reply Memorandum filed in support of its Motion for Partial Summary Judgment, the Town states that it adopted a zoning law in 1957 and it first classified the Westwoods property as "residence C" and thereafter in 1972 rezoned the property as "residence R–60" and in 1984 as "R–80." (Town's Reply Mem. Part. Summ. J. at 9–10) (citing Aff. former Town of Southampton Planner, David Emilita ¶ 4.)

It has been suggested that the Shinneock Tribe's aboriginal title has never been lawfully extinguished or terminated because no sale of the Westwoods property has ever been made which complied with the Nonintercourse Act. (Town's Aff. Ex. I.) As the Supreme Court described it, the Act, passed by Congress in 1790, "bars sales of tribal land without the acquiescence of the Federal Government."[5] *Sherrill,* 125 S.Ct. at 1484.

Moreover, the *City of Sherrill* case, (as the Second Circuit Court of Appeals said in the *Cayuga* case) definitely "altered the legal landscape" against which we *must*

consider plaintiffs' claims. *Cayuga,* 413 F.3d at 273. According to the Second Circuit, the *City of Sherrill* case holds "that equitable doctrines—such as laches, acquiescence, and impossibility—can be applied to Indian land claims in appropriate circumstances." *Cayuga,* 413 F.3d at 268 (citing *City of Sherrill,* 125 S.Ct. at 1484). One such appropriate circumstance is when a claim or an "equitable defense" involves "disruptive" Indian land claims as in *Cayuga,* where the Tribe demanded "immediate possession of the land in question and ejectment of the current residents." *Id.* at 274 (internal quotations omitted).

In a partial affirmance/partial dissent in the *Cayuga* case, *supra,* United States District Judge Janet C. Hall (sitting by designation) points out:

> [T]he clear language of *City of Sherrill* confines its holding to the use of laches to bar certain relief, not to bar a claim or all remedies:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person, who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.
> Rev. Stat. § 2116, 25 U.S.C. § 177 (2005).

---

5. As noted above, Congress passed the first Indian Trade and Intercourse Act, known as the "Nonintercourse Act," in 1790, pursuant to Congress' power under the Indian Commerce Clause, Article I, Section 8, clause 3 of the Constitution.

> The original version of the Act read in pertinent part:
>> That no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands, or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

Act of July 22, 1790, ch. 33 § 4, 1 Stat. 137, 138.

> Successive versions of the Act have been continuously in force from 1790 to the present day. *See Cayuga Indian Nation v. Pataki,* 413 F.3d 266, 268 (2d Cir.2005).

> The current version of the Nonintercourse Act reads in pertinent part:

"The question whether equitable considerations should limit the *relief* available to the present day Oneida Indians...."

"In contrast to *Oneida I* and *II*, which involved demands for monetary compensation, OIN sought equitable *relief* prohibiting, currently and in the future, the imposition of property taxes."

"When the Oneidas came before this Court 20 years ago in *Oneida II*, they sought money damages only. The court reserved for another day the question whether 'equitable considerations' should limit the *relief* available to the present-day Oneidas."

"The principle that the passage of time can preclude *relief* has deep roots in our law .... It is well-established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for *equitable relief*."

"[T]he Oneida's long delay in seeking equitable *relief* ... evokes the doctrine[ ] of laches."

"The *City of Sherrill* opinion is not support for the application of the equitable defense of laches as a bar to money damages in this case."

*Cayuga*, 413 F.3d at 288–289 (Hall, J., dissenting in part) (quoting *City of Sherrill*, 125 S.Ct. at 1487, 1489, 1494) (citations omitted) (emphasis added by J. Hall).

Further, Judge Hall states:

*City of Sherrill* holds that laches can bar a tribe from obtaining the disruptive remedy of re-assertion of tribal sovereignty. Furthermore, the case supports the proposition that the nature of forward-looking, disruptive remedies generally will serve as equitable considerations that can bar such equitable remedies as re-possession, even against the United States.

*Id.* at 290.

There are, of course, differences in the *City of Sherrill* case and the case at bar, not the least of which may be the question of the extent of the impact of the "disruptive" claims,[6] the nature of the Indians' present titles and possibly the length of the delay and the question of laches, and appropriate remedies. These are factual and legal determinations which may only be resolved at a trial.

Accordingly, the Motions for Summary Judgment must be and are hereby denied.[7]

**SO ORDERED.**

---

**6.** In most cases involving a "disruptive remedy," an Indian tribe seeks to dispossess non-Indian landowners of their property. *See Cayuga*, 413 F.3d at 269. However, a remedy may also be disruptive in cases similar to the one at bar, where dispossession is not at issue and only neighboring landowners will be affected by the Indians' claims. The Supreme Court considered such a disruption in holding that a Tribe's claim for relief from property taxes was barred by laches. *See City of Sherrill*, 544 U.S. 197, 125 S.Ct. 1478, 1482, 161 L.Ed.2d 386 (2005) ("A checkerboard of alternating state and tribal jurisdiction in New York State ... would 'seriously burde[n] the administration of state and local governments' and would *adversely affect landowners*

neighboring the tribal patches." (internal quotations omitted) (emphasis added)).

**7.** The State, Town and Defendants have also served and filed Motions to strike affidavits of "experts," declarations, objections, etc., which the Court feels (in the light of the "changed landscape" and the decisions the Court has made herein) there is no need to decide at this time.

Genealogical testimony with respect to whether current tribal members can trace their ancestry back to historic tribal members in the late 18th and early 19th century seem not to be determinative of the issues presented here. As we have indicated above, *Montoya* requires that the current tribe demonstrate

## APPENDIX

the subject of purported State enabling legislation. *See* Chapter 46 of the N.Y. Laws of 1859, Ex. W.

Shortly after the ratification of the federal Constitution in 1788, which under the Indian Commerce Clause (Article I, Section 8) granted the federal government exclusive power with respect to relations with the Indian tribes, Thomas Jefferson, then Secretary of State of the United States, had occasion to note the existence of the Shinnecock tribe of Indians in Southampton. In June of 1791, Jefferson visited the "Unquachog" Indians at the "Pusspátock [Poospatuck] settlement in the town of Brookhaven, S. side of Long island" and recorded his observations in a journal, the contents of which have survived. Jefferson noted that the Unquachog spoke "a dialect differing a little from the Indians settled near Southampton called Shinicocks and also those on Montock called Montocks. The three tribes can barely understand each other." *See*

that it is "a body of Indians of the *same* or *similar* race, united in a community under one leadership or government and inhabiting a particular *though sometimes ill-defined* territory." *Montoya*, 180 U.S. at 266, 21 S.Ct. 358 (emphasis added). While these genealogical records may cast doubt on whether all Shinnecock Indians belong to the same race, it seems clear to this Court that the members of the modern Shinnecock Tribe are of a "similar race."

In addition to the inconsistent (with the present) positions taken by the State and Town over the past 300 years (some of which are summarized above in pages 6–9), the Town alleges in its Complaint in this action that "Defendant, The Shinnecock Tribe a/k/a Shinnecock Indian Nation (the 'Shinnecock Tribe') is an Indian tribe ..." and the State Attorney General's Office has represented to this Court in open court, "I know that we have recognized (the Shinnecock Nation) and we have treated the tribe on a government-to-government relationship" for more than three hundred (300) years. (Transcript of April 26,

Ex. H. Between 1788 and the beginning of the 20th century, many other historical documents and New York State laws attest both to the existence of the Shinnecock Indian Nation and to the fact that the State and the Town each treated it as a distinct political entity. These include several petitions by the Nation to the New York State Legislature, official reports, lawsuits, numerous Acts of the New York Legislature since the 18th century and other historical materials, as set out here and in the Fact Statement.

The first of these Acts is Chapter XV of the New York Laws of 1792, which purported to establish a procedure for the annual election of three tribal trustees by voters who were "male Indians, of twenty-one years of age and upwards, belonging to the Shinnecock tribe in Suffolk County." *See* Ex. I.[2] Although the Nation does not concede the authority of the State of New York to legislate the form of its political institutions, it is a matter of historical fact

2004 Hearing, p. 20, lines 5–7.) While these inconsistent positions and representations may not be the complete answer, these two parties are claiming that they *now* correctly represent the position of the United States—this despite the fact that the United States (impleaded in this case by the Court) opted out with the consent of the Town and the State with full knowledge of the consequences, namely, (1) that the Plaintiffs have no authority to represent the position of the United States in this matter, and (2) that perhaps, (as the Defendants suggest) the Plaintiffs should not be proceeding here, without Congressional authorization, because the Defendants may be exempt from suit. The question of course, is not free from doubt; the State may have the right to review an application to create a casino and the Town may have the right to enforce its zoning laws at least in part.

2. This statute, somewhat modified in text but largely preserved in substance, now is—and since 1909 has been—Section 120 of the New York Indian Law. *See* Ex II.

that the Shinnecock Indian Nation has been united in a political community under this form of leadership since 1792.

Among the most compelling pieces of evidence that demonstrates the continuous political existence of the Shinnecock Indian Nation is an article authored by the Town of Southampton's own archivist, Toby T. Papageorge. Except for gaps in the Indian records maintained by the Town, due to the Town having lost them, the Papageorge Article records every meeting electing Shinnecock tribal trustees between April 3, 1792 and April 5, 1983. *See* Ex. L. in the preface to this article, Mr. Papageorge himself notes that "in the face of relentless denial of their racial existence, the early English settlers who usurped their land and violated their environment provided us with ironclad documentation of nearly 200 years of tribal meetings." *See id.* In light of this, it is inconceivable that the State or the Town could deny that the Shinnecock Indian Nation enjoyed continuous existence as an Indian tribe between 1792 and 1983, when the Papageorge Article was published, or subsequently. Indeed, in a letter to this Court, dated April 22, 2004, Exhibit K, the Town represented unequivocally that "since New York State's 1792 enactment of the first law establishing a trustee form of government for the Shinnecock tribe (*see* Ch. XV of New York Laws of 1792), the Shinnecocks have met annually, at the time specified by that law (and its successors), at the place specified by that law, and proceeded to elect three trustees from among only those individuals whom that law identifies as eligible candidates." There can be no better evidence than this of the existence of the Shinnecock Indian Nation as an Indian tribe, or of its political continuity for more than 210 years.

The extensive interaction of the State and the Town with the Nation throughout the 20th century also leaves no doubt that the Nation is an Indian tribe. In 1922, for example, the Shinnecock Indian Nation brought suit, as a tribe, against William W. Hubbard, a Town road

### Appendix

To The Supreme Court of the State of New York:

Pursuant to an order of this court entered herein on the 9th day of October, 1922, referring it to me to hear and determine the issues in this action, I, the undersigned, as referee, report that I first took the oath prescribed by law which is hereto annexed, and having heard the allegations and evidence of the parties on the 26th day of October 1922, and the 3rd day of November, 1922; now, after hearing Harri M. Howell, Esq., attorney for the plaintiff, and George W. Percy, Esq. attorney for the defendant, and due deliberation having been had, I decide and find as follows:

### FINDINGS OF FACT.

I. That the plaintiff is a tribe of indians recognized as such by the Government of the State of New York.

II. Cornelius H. Eleazar, Elliott A. Kellis and Seymour Eleazar are the Trustees, chiefs and head men of said tribe.

III. That before commencing this action the said chiefs and head men filed with the clerk of this court the bond required by law.

IV. That plaintiff has for many years resided on Shinnecock Neck in the town of Southampton claiming under a lease, and later under a deed from the Trustees of the Proprietors of the Common and undivided lands of the Town of Southampton; which land is arable and without timber.

V. That said residence has continued to this time and during the same and for

more than 70 years last past plaintiff and the members thereof have obtained its firewood and fencing from a tract of land North of Canoe Place, about 6 miles distant from said Neck,——

Bounded North by Peconic Bay,
East by Xtopher Holzman,
South by land formerly of Mr. Buchmuller,
West by land of Mr. Hardy and Mr. Hearn,
About 100 acres.

VI. That the plaintiff has out wood on all parts of said tract; that within the memory of living witnesses three, four or five families of said tribe resided on said tract, cultivated two or three small lots and had apple or other fruit trees, and said acts were done under claim of right.

VII. That said tract is rough, hilly and mostly sandy and fit for nothing but a wood lot and is ditched except on the North side.

VIII. That said tract is not known to have been taxed at any time or the title of plaintiff thereto to have been disputed.

IX. That early in 1917 the defendant asked Sharles Bunn who was then a Trustee of plaintiff if plaintiff would sell loam from said tract for road purposes; that a tribe meeting was called about that time which voted not to sell any soil and no subsequent meeting has voted to sell any. The Trustees before taking any action seek authority from the Tribe at a Tribe Meeting.

X. That early in 1919 the defendant, without the consent of the plaintiff and against the will and protest of Oliver Kellis, one of plaintiff's Trustees, entered upon the tract of land described in the fifth paragraph and referred to in the succeeding paragraphs and took and carried away 1,290 cubic yards of plain loam and gravelly loam and spread the same upon two highways of the Town of Southampton; on the Squiretown highway where it passes through said Indian Land and on a highway which turns off of it a little East of the Indian Land and goes down to Peconic Bay.

XI. That the teams employed by defendant for said work received $6.00 per day.

XII. That the nearest place where loam could have been bought at that time was a lot to the Westward owned by Eugene Squires; that he would have sold said loam for 25@ per cubic yard; that a team could cart five cubic yards in a day from said lot of Eugene Squires to the places where defendant laid down upon the highways the loam and gravelly loam taken from the tract above described commonly called the Indian Land.

## CONCLUSIONS OF LAW.

I. That This action is properly brought and is authorized by the Indian Law.

II. That the plaintiff has good title by adverse possession to the parcel of land described in the fifth finding of fact.

III. That the defendant wrongfully and unlawfully entered upon said land of plaintiff and removed 1290 cubic yards of loam therefrom and converted the same.

IV. That the value of said loam was 25@ per cubic yard at the pit.

V. That the damages sustained by plaintiff on account of said conversion amount to $322.50

VI. That plaintiff is entitled to judgment against the defendant for $322.50 with interest from the 1st day of May, 1919, and costs, and I direct that judgment be entered accordingly.

### Judgment.

This cause and the issues therein having been duly referred to Hobert S. Pelle-

treau, Esq., to hear and determine, and the summons and complaint having been personally served upon the defendant and he having appeared and answered, and said reference having, by consent, been executed at the court Room in the village of Southampton, Suffolk county N. Y., on the 26th day of October, 1922, and the 2nd day of November, 1922 and the said referee having attended at said time and place and the respective parties appeared by their attorneys, and the said referee having heard the allegations and proofs of the parties, and, after due deliberation, having duly made and filed his decision on the 27 day of December, 1922, containing a statement of the facts found and the conclusions of law thereon, and directing judgment as hereinafter stated; and the plaintiff's costs having been adjusted at $292.40; now, on motion of Harri M. Howell, Esq., plaintiff's attorney.

IT IS ADJUDGED: 1. That this action is properly brought and is authorized by The Indian Law.

2. That the plaintiff has good title by adverse possession to the parcel of land described in the fifth finding of fact.

3. That the defendant wrongfully and unlawfully entered upon said land of plaintiff, removed 1290 cubic yards of loam therefrom and converted the same.

4. That plaintiff recover of the defendant Three hundred Ninety-three 45/100 Dollars damages and Two Hundred Ninety-two 40/100 Dollars costs, making Six Hundred Eighty-five 85/100 Dollars ($685.85) in all, and have execution therefor.